**RAUSCHER et al. v. NORTHWEST CITIES GAS CO.**

No. B-1493.

District Court, E. D. Washington, S. D.

July 16, 1942.

See, also, 41 F.Supp. 566.

W. Stevens Tucker, of Seattle, Wash., for Securities and Exchange Commission.

Post, Russell, Davis & Paine, of Spokane, Wash., for City Bank Farmers Trust Co. and James H. Perkins, trustees under the mortgage.

Roger L. Shidler, of Seattle, Wash., for Drumheller, Ehrlichman & Co.

Alvin A. Kurtz, of Salem, Or., for Public Utilities Commission of Oregon.

Carrington, Habberton, Johnson & Walker, of Dallas, Tex., and Orrick, Dahlquist, Neff & Herrington, of San Francisco, Cal., for Bondholders' Committee.

Lehrer & Marquis, of Walla Walla, Wash., for debtor.

SCHWELLENBACH, District Judge.

These proceedings for the reorganization of Northwest Cities Gas Company (hereafter called Northwest) were instituted in this Court on January 13, 1938. On January 15, 1938, this Court approved the petition and adjudged it to be properly filed and in good faith. Notice of the proceedings was given to all interested parties and on February 12, 1938, the debtor was continued in the possession and operation of its business. At long last the Bondholders' Committee has submitted a plan for reorganization for approval or rejection by this Court. Hearing thereon was held on July 10, 1942, after due notice. The plan has the approval of the public service commissions of the states of Washington and Oregon and of the Securities and Exchange Commission. Objections were made to the plan by only one of the bondholders which acquired its bonds after the institution of these proceedings. Briefly, the plan contemplates the elimination of the present bonded indebtedness in the amount of $1,275,000; the elimination of the funded note indebtedness amounting to $1,742,500; the elimination of the present capital stock in the amount of 100,000 shares of no par common. In lieu thereof, it proposes to substitute 12,-750 shares of $5 par value common to be distributed rateably among the present holders of the first mortgage bonds now outstanding. In addition to that, interest now due on the funded debt will be eliminated and an open account due to the Lone Star Gas Corporation in the amount of $83,486.54 will be waived by that corporation.

An additional proposal is made under which Lone Star will release the bonds now owned by it upon the payment of $5,000 in cash. This proposal, if approved by me, will reduce the proposed capital stock from 12,750 shares to 10,685 shares.

Northwest was organized in 1928 to effectuate a consolidation of the gas manufacturing plants and distributing systems of seven small cities in the states of Oregon, Washington and Idaho. The total population of those cities in 1930 was 86,-221.[1] At the outset, Northwest was a subsidiary of Union Utilities, Inc. The Company's operations commenced in February, 1929. In order to acquire the properties, $1,357,500 in bonds were sold to the public. No payment of principal has ever been made on any of these bonds. Northwest was operated by a subsidiary of Union Utilities, Inc., through the medium of a management contract, from February, 1929,

| City | 1 Census 1930 | 1940 | | | |
|---|---|---|---|---|---|
| Astoria | 10,349 | 10,389 | Clarkston | 2,870 | 3,116 |
| Eugene | 18,901 | 20,838 | Walla Walla | 15,976 | 18,109 |
| Pendleton | 6,621 | 8,847 | Yakima | 22,101 | 27,221 |
| Lewiston | 9,403 | 10,548 | Total | 86,221 | 99,068 |

until October, 1929. By the latter date, Northwest was indebted to Union for funds advanced and for amounts due on the management contract in the amount of $262,654.31. In October, 1929, all of Union's interest in Northwest and all of Northwest's obligations to Union were taken over by the Lone Star Gas Company of Texas. It is apparent now, as it should have been apparent then, that under this financial burden this corporation with its meager customer possibilities competing with low priced electricity never had a chance. Even viewed through the rose-colored glasses of 1928, it would have taken either an irrepressible optimist or one utterly indifferent to financial responsibilities to have thought otherwise. Northwest never earned the amount of its fixed charges. To keep the Company in operation, Lone Star fed into it before December 31, 1937, a total of $1,825,986.54. Then Lone Star refused further financial assistance, these proceedings were commenced, and the Company has been operated as a debtor in possession since that date. There is presented to the Court the question as to whether the proposed plan of reorganization is fair and whether it is feasible.

■ Of the fairness of the plan, there can be no doubt. It eliminates all interest in the Company except that of the public holders of securities. It is true that the bondholders are asked to substitute equity investments in place of their first mortgage lien. The holders of bonds, however, must realize that they never did hold bonds of any substantial value. The Company never did earn enough to pay the interest. Had not Lone Star for so long a period been willing to carry the burden, the value of the bondholders' investment would have evaporated years ago.

■ The only opposition raised by the one opposing bondholder is that the plan proposed is not feasible. This is not made upon the theory of any particular defect in this plan. It is rather upon the theory that inherent weaknesses of this Company are such that it will not succeed. I am fully aware of the inherent weaknesses of Northwest. My problem, however, is not to determine whether beyond peradventure the plan will succeed. My task is to determine whether it probably can succeed. The word "feasible" does not connote absolute insurance of success. It means reasonable assurance of success. In arriving at this conclusion, I must consider that the alternative is bankruptcy, dissolution and the sale of the capital assets as junk.

The only standard by which a reorganized Northwest's possibility of success may be appraised is the history of its operations in the recent past in conjunction with the probable changes in conditions during the not too distant future. To better view its recent history, I have prepared three schedules. They include the last five years. The first shows net income after depreciation and before Federal taxes. In it, I have made allowance for the non-recurrence of the fixed charges on Northwest's bonded and funded debt. It is as follows:

| Plant | 1937 | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|
| Astoria | 4,342.56 | 7,224.65 | 4,564.39 | 64.20# | 2,226.43 |
| Eugene | 13,884.45 | 12,258.41 | 1,826.82 | 301.92 | 2,474.39# |
| Pendleton | 1,529.88 | 1,419.53 | 2,564.98# | 2,242.72 | 1,069.01 |
| Lewiston | 5,899.97# | 3,420.40# | 6,259.25# | 2,974.31# | 2,482.22# |
| Clarkston | | | 141.69#* | 1,289.47# | 843.39# |
| Walla Walla | 15,282.94 | 16,233.38 | 13,977.39 | 9,950.16 | 5,871.19 |
| Walla Walla Butane | | | | | 882.75 |
| Yakima | 32,008.04 | 28,381.36 | 18,329.11 | 10,483.22 | 7,140.11¹ |
| Total | 61,147.90 | 62,096.93 | 29,731.79 | 18,650.04 | 11,389.49 |

\# Deficit
* 8 months only

The sharp reduction in income evidenced by the foregoing schedule immediately challenges us with the question as to whether it resulted from decreased business. Consequently, I have prepared the following schedule showing gross income for the same years:

| Plant | 1937 | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|
| Astoria | 40,257.59 | 43,307.80 | 46,724.50 | 47,490.71 | 50,069.90 |
| Eugene | 73,297.85 | 69,800.40 | 65,184.81 | 65,886.68 | 67,780.65 |
| Pendleton | 34,156.79 | 33,697.50 | 34,385.98 | 35,092.79 | 41,001.01 |
| Lewiston | 29,440.43 | 27,843.90 | 25,419.27 | 26,630.65 | 26,396.19 |
| Clarkston | | | 2,261.75* | 2,216.65 | 2,276.99 |
| Walla Walla | 79,117.79 | 78,704.68 | 78,595.35 | 82,075.17 | 83,937.80 |
| Walla Walla Butane | | | | | 5,958.59 |
| Yakima | 101,867.33 | 99,037.43 | 93,857.92 | 89,185.65 | 88,710.23 |
| Total | 358,137.78 | 352,391.71 | 346,429.58 | 348,578.30 | 366,131.36 |

* 8 months only

From this it is clear that the Company not only held its own in gross income but actually increased it by $8,000 per year. The testimony shows that the rates charged by the Company have not increased during these years. Therefore, the volume of business increased to that extent. The answer, then, to the decreased income must be found in increased expenses. To make sure of this, I prepared the following schedule showing operating expenses including depreciation for the same years:

| Plant | 1937 | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|
| Astoria | 35,915.03 | 36,083.15 | 42,160.11 | 47,554.91 | 47,843.47 |
| Eugene | 59,413.40 | 57,541.99 | 63,357.99 | 65,584.76 | 70,255.04 |
| Pendleton | 32,626.91 | 32,277.97 | 36,950.96 | 32,850.07 | 39,932.00 |
| Lewiston | 35,340.40 | 31,264.30 | 31,678.52 | 29,604.96 | 28,878.41 |
| Clarkston | | | 2,403.44* | 3,506.12 | 3,120.38 |
| Walla Walla | 63,834.85 | 62,471.30 | 64,617.96 | 72,125.01 | 78,066.61 |
| Walla Walla Butane | | | | | 5,075.84 |
| Yakima | 69,859.29 | 70,656.07 | 75,528.81 | 78,702.43 | 81,570.12 |
| Total | 296,989.88 | 290,294.78 | 316,697.79 | 329,928.26 | 354,741.87 |

* 8 months only

In considering the last schedule, two other factors must be known: (1) There has been no material increase in taxes and (2) there has been no increase in wages or salaries which was reflected during the years 1938 to 1941 inclusive. Furthermore, the conclusion is inevitable that the increased expenses were not due to increased costs resulting from outside influences. Had that been true, the increased costs would have been more or less uniform in each one of the plants. The ups and downs in the figures for the various plants demonstrate no such uniformity. In my effort to analyze these figures, I have not overlooked the fact that, at considerable expense, a firm of efficiency engineers was employed to make a survey. I find nothing in that survey of any value in arriving at an answer to my question. I am convinced, after a careful study of this corporation and its financial records, that, after eliminating the impossible burden of fixed charges, the success or failure of this concern depends upon management. The record of the last five years demonstrates it. These increases in operation.

erating expense and resultant decreases in income are exactly what are to be expected in a fundamentally sound corporation inefficiently operated. I am in no sense critical of those who have operated this corporation during the last four years. What has occurred is the natural, logical and to be expected result of operation under the direction of the court in a reorganization proceedings. Innumerable reasons could be given to explain it. No corporation can be expected to make money when its day to day operations are subject to the approval of the court and when each day sees the possibility of the corporation's dissolution through bankruptcy proceedings.

It is apparent to me that the management here has exerted its efforts in maintaining its business and securing new business. The key to the situation is found in the testimony of the general manager of Northwest that during this period they have employed salesmen as managers of their separate plants. As salesmen they did a good job. As managers they have not done so well. Being a good salesman does not preclude a man from having the attributes of a manager. However, usually the two do not coincide. Fortunately, this proposed plan of reorganization comes at a time when managerial capacity may be substituted for salesmanship without endangering Northwest's sales opportunities. The increase of population in these communities since 1940, coupled with the fact that the freezing orders of the Federal Government prevent Northwest's competitors from proselyting its customers, make this possible. I am convinced that, taken out from under the heavy hand of the reorganization court and with proper management, the corporation may be rehabilitated so as eventually to provide a return to its stockholders. This return will never be commensurate with the amount the bondholders thought they would secure when they purchased the bonds of Northwest. Those bonds were never worth what was paid for them. Northwest never had the capital assets to justify their issuance. It never had the earning capacity to provide for their retirement. It seems to me entirely feasible that these bondholders should convert their mortgage claims into equity investments with the hope that thereby they can secure therefrom approximately the amount of the value which they originally purchased. To my mind, it is preferable to following the course of liquidation and taking only the junk value of the assets.

The opposing bondholder argues that even the small present net income is fictitious because the amounts allocated annually to depreciation reserve are insufficient. I cannot accept its argument that the amount charged to depreciation for income tax purposes is any standard. Notoriously, there is no relationship between bookkeeping depreciation charges and income tax depreciation charges. On the other side, I cannot accept the argument that credits should be given in depreciation write-offs for maintenance expense. It may be that a certain portion of the amount paid in maintenance could be used to justify lower depreciation charges. Certainly all of it cannot. There is no evidence here as to what proportionate share should thus be credited. Were this a matter of the issuance and sale of new securities, I would view the argument concerning the deficiency and depreciation allocations much more seriously. I see no reason, however, to permit it to obstruct the approval of this plan in which the acquiring of new capital is not contemplated.

At the conclusion of the hearing on this plan it was my impression that I should refuse approval until after the disposition of the individual plants, the operation of which was impracticable and until a new Board of Directors was proposed and agreed upon in lieu of the Board named in the plan of reorganization. A study of the figures convinces me that of all of the plants, the only one which should be studied from the point of view of closing is that of Lewiston, Idaho. Since it is Northwest's only plant in the State of Idaho, the Board of Directors would have no difficulty abandoning it should they deem it advisable. That task can be performed much more efficiently by the newly organized board than by the court.

Frankness compels me to state that I am not satisfied with the proposed directors. In saying this, I cast no reflection upon any one of them either as to ability, integrity or sincerity. They have been investigated by three regulatory bodies and have been approved. However, I am convinced that the board—as so constituted—would not be the kind of a board that this corporation needs. In the first place, they come from too many and too widely separated places. This board should meet with reasonable frequency. The in-

dividual members of this board should give their time and attention to the problems of this company. The expense of convening this board frequently is not one which should be borne by a company facing the problems which this one faces. Furthermore, with all due respect to the individuals named in the plan, they haven't the background desirable for the peculiar tasks which this board will be called upon to solve. The problems of this company will be those of management. The decisions concerning it should be made by men who have managed something. They need not be men who have had experience in the gas business or the public utility business. But they should have a background of having successfully run a business enterprise. With all due respect to my own profession, there is no great need for more than one lawyer on this board. The problems of this company are not financial. It will not need to borrow money and it couldn't borrow it if it tries. For the present, at least, the problems of the company are not of an engineering nature. The task which confronts this company is to take the tools and the plants it now has and properly manage them. The company does not need publicity so I see no need for a newspaper man upon the board. More important than these considerations is the fact that the company needs upon its board men who are close to the operations, who understand the business and the people in the territory the company attempts to serve. In the report of the S. E. C. and those of the public utility commissions of the two states, reference is made to the maintenance of service for the benefit of the public. If these three regulatory bodies are correct in this, insurmountable difficulties should not be met in securing the services of men whose interests in the communities in which these plants operate are such as to induce them to give of their time for the protection of the public in those communities. In addition, the members of the board of directors of this corporation should have the will to make it succeed. They should believe that it can succeed.

Logically, my views as outlined in the last paragraph would require me to reject approval of the plan until a board which I consider qualified is named. However, this reorganization has been before this court for four and one-half years. If the experience of the past is any guide, such action on my part would probably result in another six months' delay. It happens that, if this reorganization can be consummated within the reasonable future, there is the possibility of adjustment of the rates of Northwest in such a way as to materially increase its income. In addition to that, I am so anxious that the handicaps to the management resulting from the fact that the corporation is in court should be removed as quickly as possible. In the light of these two considerations, I have decided to approve the plan as submitted with the expression to the membership of the board of directors of my opinion that, as rapidly as possible, those of them who do not qualify in accordance with the standards I have described should permit themselves to be superseded by men so located and possessed of the attributes which will enable them to solve the managerial problems of this corporation.

There remains for consideration only the proposal that the Lone Star Gas Company take $5,000 in cash in payment for its $206,500 of bonds, thereby reducing the capital stock liabilities of the new corporation to the extent of 2,065 $5 par value shares. It is clear that good business requires the acceptance of this proposal. Consequently, I approve it.