**BEAUFORT TRANSFER COMPANY, a Corporation, Plaintiff-Respondent,**

v.

**FISCHER TRUCKING COMPANY, a Corporation, and Harry Morris, Defendants-Appellants,**
**and**
**Philipp Transit Lines, Inc., a Corporation, Intervenor Defendant-Appellant.**

**No. 54176.**

Supreme Court of Missouri,
Division No. 2.

Feb. 9, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied March 9, 1970.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Myron Gollub, St. Louis, for plaintiff-respondent, Beaufort Transfer Co.

Thompson, Mitchell, Douglas, Neill & Guerri, Donald J. Stohr, Gary T. Nelms, St. Louis, for intervenor defendant-appellant, Philipp Transit Lines, Inc.

Flynn & Parker, Norman C. Parker, St. Louis, for defendants-appellants, Fischer Trucking Co. and Harry Morris.

MORGAN, Judge.

Beaufort Transfer Company, a corporation, sought specific performance of what was alleged to have been a binding contract of Fischer Trucking Company, a corporation, and Harry Morris, its president, to sell certain intrastate and interstate common carrier operating rights to Beaufort. The Philipp Transit Lines, Inc., alleged it had purchased the same operating rights from Fischer and was allowed to intervene as a party defendant. The trial court decreed specific performance of the contract as prayed by Beaufort and the three defendants have appealed.

It is agreed that Fischer was having financial difficulties which became critical during the year 1966. Its assets were encumbered by a chattel mortgage in addition to liens for delinquent taxes filed by the Internal Revenue Service. Negotiations for sale culminated in the two contracts now in dispute.

On September 8, 1966, Harry Morris, in the office of an attorney, signed what was entitled an "Earnest Money Receipt," individually, and as the president of Fischer. It recited a sale price of $33,000, payable by an initial payment of $250, payment of which was acknowledged, and the balance of $32,750 within thirty days after the Interstate Commerce Commission and the Missouri Public Service Commission had approved the transfer of the operating rights. Fees and expenses in connection with the transfer were to be divided equally; certain debts were to be liquidated in accordance with a disbursement letter; and, in consideration of the purchase, Fischer and Harry Morris, individually, agreed to "enter into an agreement not to compete with Buyer (Beaufort) as to the operating rights transferred herein containing terms satisfactory to Buyer." The attorney prepared proposed corporate resolutions for adoption by the boards of directors of Beaufort and Fischer, and they were to be returned to the attorney the next day. However, those of Fischer were not returned, and the attorney later received a letter from Harry Morris, dated September 14, returning the $250 down payment and expressing regret "we were unable to get our board of directors to ratify the contract between Fischer Trucking Company and Beaufort Transfer Company."

Philipp, intervenor-defendant, declares in its brief that, "On September 14, 1966, Fischer and Philipp substantially agreed on terms of sale of the same operating rights to Philipp." The agreed sale price was $40,000, but the contract was not formalized until September 20. The validity of this contract has not been challenged, but obviously its effectiveness depends on whether or not Fischer had any carrier rights to sell on September 20. Clearly, it did not if the agreement to sell to Beaufort, dated September 8, was binding on Fischer.

Fischer denies any obligation under the purported contract of sale to Beaufort, because:

(1) The sale, being for substantially all the corporation's assets, was not approved by the board of directors as required by Section 351.400, RSMo 1959, V.A.M.S.

(2) The parties did not intend that there would be a binding agreement until the proposal was approved by the boards of directors of Beaufort and Fischer.

(3) The contract is not susceptible of specific performance for the reasons: (a) The Interstate Commerce Commission and the Public Service Commission, not being parties to this action, need not comply with the decree as entered by the trial court, and (b) The terms of the noncompeting obligation of Harry Morris and Fischer were left, by the contract, to future agreement of the parties.

Philipp, intervenor, adopts the arguments of Fischer and further submits:

(1) Specific performance of the Beaufort-Fischer Contract will cause unreasonable and disproportionate hardship and loss to Philipp, because it has made substantial expenditures for road equipment and docking facilities in reliance on its contract of September 20.

Admittedly, with respect to the Beaufort contract, the specific procedure outlined in Section 351.400, was not followed. It, in part, provides:

"A sale * * * of all, or substantially all, the property and assets * * * of a corporation, if not made in the usual and regular course of its business * * * may be authorized in the following manner:

(1) The board of directors may adopt a resolution recommending such sale * * * and directing the submission thereof to a vote at a meeting of shareholders * * *

except that such proposed sale * * *need not be adopted by the board of directors and may be directly submitted to any meeting of shareholders;*

(2) (Notice of Meeting.)

(3) * * * the shareholders may authorize such sale * * * (by) * * * the affirmative vote of the holders of at least three-fourths of the outstanding shares entitled to vote * * *;

(4) After such authorization * * * the board of directors * * * in its discretion * * * may abandon such sale * * * *subject to the rights of third parties under any contracts relating thereto * * *."* (Emphasis added in each instance.)

The italicized portions of the statute would compel these conclusions: (1) holders of three-fourths of the shares outstanding may approve such a sale without prior approval of the board of directors, but (2) the board, in its discretion, may abandon the sale "subject to the rights of third parties under any contracts relating thereto." As such a third party, Beaufort contends its contractual rights are not defeated by the absence of a formal approval by the board of directors, since Harry Morris owned one hundred percent of the outstanding shares and had complete control and ownership of the corporation. The argument is not new nor novel. In the early case of Union National Bank v. Shoemaker, 68 Mo.App. 592 (1897), three shareholders, owning all outstanding shares of a corporation, transferred corporate property in disregard of regulatory statutes and the court held: "They were in fact the corporation, and whatever all these shareholders did or consented to must be treated as the act of the corporation." See Land Clearance For Redevelopment Auth. v. Zitko, Mo., 386 S.W.2d 69, 81 [26]. The purpose of Section 351.400 was fully considered by this court in the late case of

Still v. Travelers Indemnity Company, Mo., 374 S.W.2d 95, wherein it was concluded that, "The statute on the sale of corporate assets is designed primarily for the protection of stockholders of the corporation." As to the effect of noncompliance with this section, the court determined that no public policy consideration was created, and that a transaction which does not follow the prescribed procedure is not, of necessity, unlawful or void. In reliance on the *Still* case, this court again declared in Flarsheim v. Twenty Five Thirty Two Broadway Corp., Mo., 432 S.W.2d 245 at 250, that: "There is a considerable number of instances where corporate officers dispose of the corporate assets in good faith but with little or no regard for the methods of sale and dissolution procedures provided by law. However, the general penalty provision of the corporation law, § 351.715, does not make transactions not in compliance with procedures of the corporation law void as against public policy."

Fischer relies primarily on the case of Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 235 S.W. 435 (and cases therein cited) as well as Josephine Hospital Corporation v. Modoc Realty Co., 307 Mo. 336, 270 S.W. 638. However, we do not consider either controlling, for in each case there were minority stockholders, perhaps nominal, whose interests were being ignored and which the statute in question was designed to protect. A further question of diversion of corporate assets was involved.

The Fischer Board of directors was composed of Harry Morris, his wife, young daughter and a friend. After their testimony that the board met on September 8 to consider the sale to Beaufort, the trial court made this finding: "The Court does not believe any of the defendants' testimony with respect to an alleged meeting of Directors of defendant corporation. * * *" The trial court further found that Harry Morris was sole owner of the corporation, that the Beaufort contract had been approved by one hundred percent of

the voting shares of Fischer, and that there was no one within the purview of the statute (Sec. 351.400) with standing to object. With this we agree, if Harry Morris was, in fact, the owner of all outstanding shares of Fischer.

During times of interest here, 300 shares of stock of Fischer were outstanding. One certificate for 150 shares was in the name of "Harry or Olwyn Morris." The latter is the wife of Harry Morris and also corporate secretary of Fischer. Prior to February 7, 1966, another certificate for 150 shares was in the name of Walter Erb. The acquisition of these shares by Harry Morris is reflected in the board minutes of Fischer dated February 7, 1966. They, in part, provide: "* * * Walter Erb in accordance with an agreement between himself and Harry Morris * * * surrendered to Harry Morris 150 shares." The consideration, a note for $5,000, payable to Mr. Erb, was secured by delivery of the certificate to a bank under an escrow agreement. The minutes then continue: "Walter Erb upon receipt of the note resigned as President of the company and as Chairman of the Board relinquishing all prior and/or subsequent rights." The certificate shows transfer of ownership to Mr. Morris by Mr. Erb. We agree with the trial court that Mr. Morris became owner of these shares, with all voting rights, upon transfer and such rights were not returned to Mr. Erb by the security arrangement. In any event, Mr. Erb has asserted no rights as a "dissenting shareholder," and on September 20 he acknowledged satisfaction of the debt and released the escrow bank from any obligation. On this date a new certificate, for the former shares of Mr. Erb, was issued in the name of "Harry or Olwyn Morris." Thus, all outstanding shares were so issued, and the legal significance thereof is the decisive issue presented.

■ The parties agree as to the law on this issue but disagree as to its proper application to the facts of this particular case. This chose in action, as so designated, created a presumption of ownership by the entirety which could be overcome only by competent evidence which was so unequivocal as to leave no doubt the intent of the parties was otherwise. In Re Estate of O'Neal, Mo., 409 S.W.2d 85; Jenkins v. Meyer, Mo., 380 S.W.2d 315; Longacre v. Knowles, Mo., 333 S.W.2d 67; In Re Baker's Estate, Mo.App., 359 S.W. 2d 238, 243. In seeking to evaluate the evidence to resolve whether or not this "presumption of ownership" was rebutted, we need not detail alleged declarations and activities of Mr. Morris indicating he was the sole owner of Fischer, because much more persuasive is the record evidence reflecting not only his intent but also that of Mrs. Morris. In a letter of August 19, 1966, to Beaufort, by authority of Fischer, the following is of interest: "Any accounts receivable due prior to the date of agreement will naturally be payable to the *present owner of Vendor, Mr. Harry Morris.*" (Emphasis added.) More directly in point is the following excerpt from corporate minutes of Fischer dated February 8, 1966: "Harry Morris, being the holder of all of the voting shares of stock in the company was present." Mrs. Morris prepared these minutes and signed as secretary, as did all members of the board of directors. Mr. Morris further testified the minutes were true and accurate. We find nothing in the record indicating the intent of Mr. Morris and Mrs. Morris was otherwise, but, to the contrary, find all of the evidence to be consistent with the minutes as written. It would be difficult to conceive of more convincing proof of the intent of the parties, and we conclude that the "presumption of ownership" was rebutted by competent evidence.

■ Fischer further contends the contract is not susceptible to a decree of specific performance for the reasons heretofore listed. Obviously, the contract was written in contemplation of future ICC and PSC approval and resolving of details pertaining to the non-competing agreement. However, the possible effect, if any, such con-

ditions might have had on this issue have become moot. Beaufort, in its brief, declares: " * * * Beaufort does not ask the Court to compel the ICC or the PSC to do anything." In passing, we notice an order of ICC, in the record, approving transfer of the questioned carrier rights to Beaufort, subject to Beaufort prevailing in the instant case.

As to the proposed noncompeting agreement, we find nothing in the record inconsistent with the finding of the trial court that: " * * * no evidence was presented that plaintiff was insisting upon compliance with this sentence of the contract. This portion of the contract was entirely abandoned by the parties and only raised for the first time after trial." Furthermore, the performance required need not be identical with that promised. Restatement of Contracts, Sec. 359(2).

 Looking now to the intervenor—Philipp, we consider its argument that unreasonable and disproportionate hardship will be suffered because of its reliance on its contract of purchase on September 20. This contention is based on the submitted principle that, " * * * where a bill is brought for the specific performance of a contract, the after-acquired rights of third parties are equitable considerations to be regarded in adjudicating the questions." Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S.W.2d 905, 909. However, it is of interest that in the sentence following the above quote, the court further said: "The contract will not be enforced to the harm of the innocent." See also Landau v. St. Louis Public Service Co., 364 Mo. 1134, 273 S.W.2d 255. No definition of the word "innocent" was given, but common sense demands it be limited to those who act in ignorance of or in reliance on the contract in question, and that those, with knowledge, who act in utter disregard of it are in no position to assert rights under such an equitable principle. Evidence was offered that Philipp did make substantial expenditures to increase its capacity so that it might assume Fischer's

obligations. All appear to have been after October 1, 1966, and the knowledge of Philipp on that date becomes relevant. The trial court specifically found that Philipp " * * * did not expend any sums whatsoever * * * prior to its learning of the contract between plaintiff and defendants, even under intervenor's own evidence." All of the testimony and exhibits in evidence confirm the correctness of this finding. For this reason, Philipp can not sustain either position of being in "ignorance" of or of having acted in "reliance" on the Beaufort-Fischer contract of September 8, 1966.

The decree and judgment of the trial court is affirmed.

All of the Judges concur.