**In re LANDAU BOAT COMPANY, Debtor.**

Bankruptcy No. 80–00716–S–11.

United States Bankruptcy Court, W. D. Missouri, S. D.

Aug. 28, 1981.

Gary A. Love, Springfield, Mo., for debtor.

Gary Nelms, Springfield, Mo., for Reynolds Metals.

James Bowles, Springfield, Mo., for Empire Bank.

Randall Sutter, Lebanon, Mo., for Roy Knight, Williams-Keepers D. H. Smith Co. and Lawton-Byrne-Bruner.

Blythe Crist-Brown, Springfield, Mo., for Central Bank of Lebanon.

Joe C. Greene, Springfield, Mo., for Bass Pro Shops.

James McLeod, Springfield, Mo., member creditors committee.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

In this Chapter 11 proceeding, debtor's original plan was rejected by the impaired class of unsecured creditors. Debtor's request that the plan be "crammed down" under Section 1129(b) was denied by the Court, holding that the plan did not meet the "fair and equitable" test where unsecured creditors were not paid in full and shareholders retained their interest in the debtor, the corporation having some value as a going concern and with a reasonable expectation of future profit. *In re Landau Boat Company*, 8 B.R. 436 (Bkrtcy., W.D. Mo.1981).

Debtor then filed an amended plan in which it was proposed that the existing common stock be cancelled and a new class of common stock be issued and be made available to purchasers, including creditors, at par of $1.00 per share. The plan also required subscribers to "offer an irrevocable loan commitment in the sum of Three ($3.00) Dollars for each dollar ($1.00) of stock purchased." The plan stated the shareholders of the corporation presently holders of debtor's stock had offered to purchase the issue in its entirety but that the Court had the right to allocate the division of the stock if some creditors subscribed. Unsecured creditors were to be paid from this fund and were still impaired under the plan.

This plan and an amended disclosure statement approved by the Court were distributed to creditors. The unsecured creditors again rejected the plan. In addition, one secured creditor, Central Bank of Lebanon, although characterized as unimpaired, affirmatively rejected the plan. Debtor filed its timely motion that the plan be confirmed under the provisions of Section 1129(b). Hearings were held on confirmation on May 29, 1981 and June 23, 1981. Debtor appeared by counsel and its president; various creditors appeared by counsel. Evidence was heard and the matter taken under advisement pending the filing of briefs which have now been received.

Section 1129(b) provides, in part, that: "If all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such

paragraph if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

Section 1129(a)(8) permits confirmation if each class has accepted the plan or is not impaired. The class of unsecured claims has not accepted and is impaired. The class of secured claims is characterized as unimpaired and there is no evidence to the contrary but Central Bank of Lebanon, a member of the secured class, has rejected the plan. No other member of the secured class has voted. Section 1126(f) provides that "a class that is not impaired under a plan is deemed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims . . . of such class is not required."

In *Marston Enterprises, Inc./Spring Run Apartments,* (Bkrtcy., E.D.N.Y.1981), the sole secured creditor, who was unimpaired, affirmatively rejected the proposed plan. The unsecured creditors rejected the plan. The Court held that an unimpaired creditor could rebut the presumption of Section 1126(f) that it was deemed to have accepted the plan by affirmatively rejecting it. There, although the requirements of Section 1129(a)(8) were met because a class was not impaired, the requirements of Section 1129(a)(10) were not met because no class accepted the plan. The plan, therefore, could not be confirmed.

By affirmatively rejecting the plan and advancing the argument set out in *Marston* that there must be affirmative acceptance by a class to meet the requirement of Section 1129(a)(10), Central Bank seeks to bring this plan within the holding of *Marston* and prevent confirmation. The argument is not persuasive for two reasons.

■ First, the Court does not agree that Section 1129(a)(10) has to be read as requiring a class to accept affirmatively before a plan can be confirmed. If the assumption that the acceptance presumed in Section 1126(f) can be rebutted is correct, the further argument in *Marston* that there must be an affirmative acceptance to satisfy Section 1129(a)(10) requirements is unnecessary

to the holding. It is enough to support the holding in *Marston* that the secured creditor has rebutted the presumption by affirmatively rejecting.

■ Section 1129(a)(10) provides that the Court find that one class has accepted but that determination must be made after excluding insiders holding claims in the class. If the Congress had intended that there be an affirmative acceptance requirement in the section, it would have been easy enough to insert such a word. The language is not there and should not be implanted by the Court. Nor is it persuasive to point to the proposed technical amendment to Section 1129(a)(10) S.863, 97th Cong. 1st Sess. § 107 (1981) as that language limits itself to impaired claims. This Court concludes that the thrust of Section 1129(a)(10) is the direction that the Court disregard the vote of insiders in calculating, under Section 1126(c), whether a class has accepted the plan.

■ Second, there are five secured creditors scheduled. The claim of one, Commerce Bank of Lebanon, has been altered in character because the security in which it has a lien has been surrendered to it. A class accepts if more than one half of the creditors holding "at least two-thirds in amount of the allowed claims of such class" accept. Section 1126(c). The four remaining secured creditors are not impaired and therefore are deemed to accept, but one has affirmatively rejected. Three are therefore presumed to have accepted. These three hold claims in amounts more than two-thirds of all secured claims and the class has accepted. The Court therefore finds that the requirements of Section 1129(a)(10) have been met.

■ Reynolds argues that the plan cannot be confirmed because it does not meet the disclosure requirements of Section 1129(a)(5). Not all of the information required in that subsection was set out in the disclosure statement but all the principal parties have been identified in testimony and in filings with the Court. The evidence shows that Mr. Feaman, the current presi-

dent, will be continued in his present position and that there is some uncertainty as to his future and as to future roles of the new shareholders. Considering the future of the debtor and the enlargement of its activities in the next two years, such uncertainty is not inexplicable.

During the course of these proceedings, there was evidence of a misappropriation and debtor began an audit which was never completed. In addition, debtor steadily lost money while operating. On the other hand, debtor has filed its required reports, although not always on time. Mr. Feaman has appeared at each hearing and responded openly to questions from creditors and from the Court. The details of the misappropriation were not investigated by the creditors committee. The plan provides that the relationship with the present creditors will end with a lump sum payment. Creditors will not have to rely upon management capabilities for the payment of debt. Of course new creditors will have to be wary, but that is true of any business venture.

At the hearing on confirmation, C. J. Heck testified on behalf of debtor. He was a shareholder of Directional Industries and was to be a new investor in debtor. He was a banker and operator of a retail boat business. His testimony revealed substantial business background and a very real appreciation of debtor's problems, needs and potential. The Court is impressed with the business acumen and experience which Heck will bring to the operation. That discipline and adequate investment should enable debtor to succeed over the long term.

■ Perhaps the leading case on rejection of a reorganization, because of management misconduct, is *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). There the evidence showed that the parent company failed to adequately capitalize the subsidiary or to provide independent management so that the debtor would be operated in its own best interests. In the case before the Court there is a parent-subsidiary relationship but no showing that abuse of that relationship was the cause of insolvency. In addition, while there is a retention of the relationship in a different form, it is for new consideration and is not based, as it was in *Taylor*, supra, upon stock issued for equity.

Mr. Feaman's continuance as operating officer of the debtor, in light of the plan, is consistent with the interests of creditors and equity security holders and with public policy, as Section 1129(a)(5)(A)(ii) contemplates. There is insufficient evidence, when contrasted with his conduct as observed by the Court over the time, to conclude that Mr. Feaman is disqualified from continued association with the debtor. Cf. *Rauscher v. Northwest Cities Gas Co.*, 46 F.Supp. 49 (D.C.E.D.Wash.1942).

■ Creditors, and specifically Reynolds, challenge the feasibility of the plan. The Court notes that the plan proposes to dispose of over $700,000 of unsecured debt for payment of 10% of that amount and to make available over $300,000 in operating funds. The lack of operating funds has been a major handicap to debtor. Debtor manufactures a competitive product that does have a ready market. Insofar as it is possible to forecast feasibility, the elimination of debt, together with the infusion of funds, in light of the market that exists, point toward successful performance. The Court rejects the challenge to feasibility.

The Court finds that the plan meets the requirements of Section 1129(a) except for Section 1129(a)(8). The plan, therefore, may be "crammed down" if it is fair and equitable to the rejecting class. As to the class of unsecured claims, the plan is fair and equitable if:

"(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

"(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property" Section 1129(b)(2)(B).

The plan provides that the class receive only 10% of its allowed claims. The question then is whether any junior claim or interest receives any property. In denying cram down in the earlier proceeding, this Court found that the shareholders clearly retained an interest "for prospective earnings and for control", 8 B.R. at 439, and with some possibility of the realization of immediate equity. Over the course of this proceeding, the testimony has been that the value of the real property does not exceed the amount of the lien against it. There is some question whether the value of the machinery and equipment exceeds the amount of the lien. An independent appraisal sets the value at half the amount of the lien. The scheduled values exceed that amount but debtor's representatives testified that many of the scheduled items have been sold or otherwise disposed of. The evidence does not permit the Court to set a precise value on the machinery and equipment but does permit the conclusion that the value by which such property exceeds the amount of the lien is nominal at best, leaving little or no equity to be realized by the shareholders.

Under the first plan, debtor did not make clear whether there was to be new equity contributions such as would justify retention of an interest by the shareholders. The amended plan specifically calls for new investment and an irrevocable commitment to a loan for operating funds from the investors.

" . . . to justify a retention of stock interest by stockholders of a debtor it must appear that they have furnished some compensatory additional consideration or have an equity in the estate of the debtor after the rights of creditors are fully provided for. *Sophian v. Congress Realty Co.*, 98 F.2d 499, 502 (8th Cir. 1938).

The Court in *Marston*, supra, deals with retention of interests by existing shareholders where new investment is made.

"Section 1129 . . . requires that where the dissenting class receives less than the full amount of its claim, no inferior class may retain any interest or receive any distribution. Thus, if no new money were contributed or the amount contributed a trivial sum, the retention of an interest by an inferior class would be a fatal defect."

"There is no reason why investors of new capital who happen to be shareholders, whose equity interest as old shareholders is extinguished, should be disqualified from investment in the reorganized corporation, where their contribution is substantial . . ." Marston, supra.

Reynolds asserts that the contribution is not substantial. The new money will permit payment of the unsecured debt at the rate set out in the plan and leave $35,000 for capital uses. In addition, the commitment to invest requires the investor to make a loan to the debtor. Since the stock issue is fully subscribed, the new investors will be required to loan an additional substantial sum to the debtor. And, while the plan proposes that such loans be embodied in 90 day notes, there is no evidence that debtor would have the ability to repay such amounts in that period. In fact, debtor's reports over the year suggest that repayment within 90 days will be impossible. Thus, the amount of funds to be made available by the new investors is substantial.

Reynolds also asserts that the investment, even if substantial, allows the new investors to have equity value without consideration because debtor, as a going business, is worth more than the investors are paying. Reynolds points to the testimony of Heck, the witness offered by debtor, who stated that a boat builder should be capitalized at 4 to 8 times earnings in these times. Since other testimony predicted profits in 1982 and 1983, Reynolds contends that the true value of the debtor is about $240,000 and therefore the investment is insufficient.

"The commercial value of property consists in the expectation of income from it . . . . Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties . . . . The criterion of

earning capacity is the essential one ... if the allocation of securities among the various claimants is to be fair and equitable .... Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earnings capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance." *Consolidated Rock Products v. DuBois*, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941).

Debtor presently rents a portion of its manufacturing facility to another aluminum boat maker, who is apparently profitable. There is no evidence as to that other boat maker's gross sales or whether its product competes with that produced by debtor. Debtor has stated that it will evict the other boat maker at the end of 1981 if the plan is confirmed for it will need all the space for projected manufacturing. Debtor projects that in the 1982 manufacturing season, it will earn $16,000 before taxes and in the 1983 manufacturing season it will earn $80,000 before taxes. Both of these estimates are based upon gross of $2,000,000 or over and profits are calculated before debt service. The debt is to be paid at market rates of interest. Debt service will leave no projected profit in 1982 and only a small projected profit in 1983.

Debtor's financial report for the eleven month period ending May 31, 1981 shows gross sales of $569,526.11 and a net loss of $144,170.87. At an annual rate, debtor's gross sales will be about $620,000 with a net loss of $156,000. Heck, testifying on behalf of the new investors, seems confident that sales could be raised to $2,000,000 in 1982 and $2.5 Million in 1983. He gave no specifics as to how this was to be achieved but did indicate that substantial operating funds would be necessary.

On February 9, 1981, the Court authorized debtor to borrow $35,000 to enable it to purchase materials to fill various orders. Debtor represented that it would make a profit on this activity. The funds were not to be used for the payment of secured debt but only for payment of expenses related to production. Weekly reports were required. The first report was filed March 13, 1981. Reports through early July 1981, a period of 17 weeks, and in the height of the selling season, show gross receipts of $326,803.09 and expenditures of $321,750.27. No payment for secured debt was charged against this activity. While it thus appears that, at this level, gross sales would be very close to $1 Million, there would be no profit.

■ This examination of the financial reports and the operating experience of debtor show that debtor has the potential to be profitable. However, in light of debtor's financial needs, the state of the economy and the fact that debtor is in a highly competitive business, the Court can only conclude that the probability of debtor making a profit in the next two years is unlikely. The Court, therefore, finds that the new investors are making a substantial investment which exceeds any value which can be realized from the business in the foreseeable future.

One last issue remains. Debtor seeks to cancel its stock and issue new stock for new investment. The old stock is the sole asset of Directional Industries, 78% of whose shareholders voted to surrender the stock to debtor. The stock is pledged to Central Bank as additional security for its loan to debtor. Central Bank has not agreed to surrender physical possession of the certificates, although the stock has little or no value as security. Reynolds contends that the stock may not be cancelled without the unanimous consent of the shareholders of Directional Industries since it constitutes all the assets of that corporation, citing Section 351.400, R.S.Mo.1969.

That section of Missouri law establishes procedures for the sale or disposition of corporate property not in the usual course of business. The proposed disposition must

be approved by "the affirmative vote of the holders of at least two-thirds of the outstanding shares entitled to vote." Section 351.400(3). The resolution of disposition was approved by 78% of the outstanding shares.

In construing this section, the Missouri courts have held that it is intended to protect the shareholders, *Still v. Travelers Indemnity Company*, 374 S.W.2d 95, and that "a transaction which does not follow the prescribed procedure is not, of necessity, unlawful or void." *Beaufort Transfer Co. v. Fischer Trucking Co.*, 451 S.W.2d 40, 43 (Mo.1970). The statute makes clear that the transaction "may be made upon such terms and conditions and for such consideration . . . as may be authorized." Section 351.400. The rights of the dissenting shareholders are defined in Section 351.405, R.S. Mo.1969.

It is apparent, as a matter of Missouri law, that Reynolds as a creditor has no standing to challenge the disposition by Directional Industries for its Landau stock. *Kaufman v. Henry*, 520 S.W.2d 152 (Mo. App.1975). It is also held that the failure to comply with the provisions of Section 351.400 does not raise issues of public policy. *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245, 250 (Mo. 1968). The issue raised by Reynolds, therefore, does not rise to a failure to meet the requirements of Section 1129(a)(3), Title 11, U.S.C. which prohibits confirmation of a plan "proposed . . . by any means forbidden by law."

On the basis of the foregoing, the Court finds that the "plan does not discriminate unfairly, and is fair and equitable with respect to the class of claims that is impaired under and has not accepted the plan." Section 1129(b)(1). The motion of debtor to confirm is SUSTAINED. The Plan is CONFIRMED effective September 1, 1981.

SO ORDERED this 28th day of August, 1981.