**WOOSTER REPUBLICAN PRINTING COMPANY, Plaintiff,**

v.

**CHANNEL 17, INC., et al., Defendants.**

**No. 79–4175–CV–C.**

United States District Court,
W. D. Missouri, W. D.

June 4, 1981.

G. Stephen Long, Shughart, Thomson & Kilroy, Kansas City, Mo., for plaintiff.

Cullen Cline, Columbia, Mo., Alex Bartlett, Bartlett, Venters & Pletz, P. C., Jefferson City, Mo., for defendant Channel 17.

Charles E. Patterson, Kansas City, Mo., for defendant Tapeswitch.

## MEMORANDUM AND ORDER GRANTING JUDGMENT IN FAVOR OF THE WOOSTER REPUBLICAN PRINTING COMPANY AND AGAINST CHANNEL SEVENTEEN, INC. AND TAPESWITCH CORPORATION OF AMERICA AND DENYING THE COUNTERCLAIMS OF CHANNEL SEVENTEEN AND TAPESWITCH CORPORATION, THE CROSS–CLAIM OF TAPESWITCH, AND THE THIRD PARTY CLAIM AGAINST RICHARD KOENIG

SCOTT O. WRIGHT, District Judge.

Plaintiff, the Wooster Republican Printing Company (Wooster), is a closely-held family corporation which owns and operates daily and weekly newspapers, radio stations, and a commercial printing business. Defendant, Channel Seventeen, Inc., (Channel Seventeen), is a closely-held Missouri corporation which owns and operates a UHF television station in Columbia, Missouri, as an ABC network affiliate under the call letters, "KCBJ–TV." This diversity action was initiated by Wooster, an Ohio corporation, to enforce an alleged contract "to sell the assets, property and business of defendant, excluding bank accounts, cash-on-hand and accounts receivable." Alleging the uniqueness of the business of Channel Seventeen and an anticipatory breach of the contract by repudiation, Wooster primarily seeks specific performance of the alleged agreement. Alternatively, should specific performance be determined inappropriate, Wooster seeks damages in the amount of $912,053.02. Plaintiff also seeks attorneys fees, costs and expenses in conjunction with its claim for specific performance.

Channel Seventeen denies the existence of the alleged contract for the sale of its assets, property and business. It contends that a requisite number of its shareholders did not approve a sale of its corporate assets, as required by Section 351.400 RSMo.; that, in fact, its shareholders specifically

voted to disapprove the contract; that Wooster has not fulfilled its obligation under the contract to place $50,000 in an escrow account; that the clause of the alleged contract providing for the remedy of specific performance is unenforceable; that Wooster is precluded from obtaining specific performance of the alleged contract or damages for its breach because of a course of conduct on the part of the officers and agents of Wooster which misled Richard Koenig, president and majority shareholder of Channel Seventeen, and Robert Koenig, his brother and a shareholder in Tapeswitch Corporation of America, a corporation which purportedly owns 45% of the corporate stock of Channel Seventeen; that Wooster is foreclosed from either specific performance or damages because it has failed to fulfill the contractual conditions precedent to litigation; and that the alleged contract purports to convey property, specifically a transmitter site and tower, the title to which Channel Seventeen does not possess. In the event that the alleged contract is determined to be in existence, Channel Seventeen seeks the recision of that contract.

Upon the motion of Channel Seventeen, made pursuant to Rule 19, F.R.Civ.P., Tapeswitch Corporation of America (Tapeswitch), a New York corporation, has been joined herein as a party defendant.[1] Tapeswitch asserts rights as an owner of 45% of the corporate stock of Channel Seventeen and essentially raises defenses to enforcement of the contract which are similar to those raised by Channel Seventeen; specifically, that no contract exists; that, as an owner of more than one-third of the corporate shares of Channel Seventeen, it has never approved the sale of the corporate assets; that execution of the contract was obtained by Wooster through the fraud and deception of its agents and officers; and that the contract purports to convey certain property which is not owned by Channel Seventeen.[2] By counterclaim and cross-claim, Tapeswitch also seeks a declaratory judgment that the contract is null and void, and to enjoin the sale of the assets of Channel Seventeen. It has also joined Richard Koenig, as majority shareholder and chief executive officer of Channel Seventeen, to obtain indemnification for "any monetary losses as a result of the purported agreement."

After a substantial period of pretrial discovery and upon the agreement of the parties, the cause was tried to the Court without a jury. The pleadings of the parties, the testimony of the witnesses adduced at trial, the documentary material in evidence, and the stipulations of the parties reveal the following.

*Findings of Fact*

*Background and Events Preceding Contract Negotiations*

Channel Seventeen has operated as a UHF television station in Columbia, Missouri since 1971 when it began broadcasting. At all relevant times, Richard Koenig was the president and majority shareholder of the corporation, owning 55% of the outstanding stock. His brother, Robert Koenig, controlled the remaining 45% of the stock of Channel Seventeen, either as an

---

1. By Order of March 19, 1980, Judge Ralston, the United States Magistrate to whom this cause was then referred, granted the motion of Channel Seventeen to join Tapeswitch as an additional party. Tapeswitch, alleging status as a minority shareholder of Channel Seventeen, had brought suit in the Circuit Court of Moniteau County, Missouri, to enjoin the sale of the corporate assets of Channel Seventeen. The present action, brought to compel the sale of those assets, was then pending. There then existed a strong indication that Channel Seventeen would confess judgment in the state court action and acquiesce in the injunction. Finding that Channel Seventeen might be "subject to a substantial risk of incurring . . . inconsistent obligations" and that the "ability of [Tapeswitch] to protect its interest in the subject matter of this litigation would be impaired or impeded unless joinder [was] required," Judge Ralston directed that Tapeswitch be made a party defendant.

2. In its answer, Tapeswitch denied the existence of proper venue in this district. However, it has since abandoned that assertion and now admits that the various claims, counterclaims and cross-claims arose in the Western District of Missouri.

individual owner or through his control of Tapeswitch Corporation of America.[3] From April 1, 1978 to the time of trial, Richard Koenig was the president of Channel Seventeen and Robert Koenig was its vice-president, treasurer and secretary. Both were the exclusive members of the board of directors of the corporation.

In May of 1978, John Tupper, a member of a brokerage firm specializing in acquisitions of television and cable television stations, wrote Richard Koenig to identify himself and to indicate that he represented a client "who would be very interested in acquiring KCBJ–TV Columbia, Missouri." In the letter, Tupper stated that Koenig should consider "a 1978 transaction" if he had "any thoughts of trading within the next few years" because the "market for television stations [was] at or near its cyclical peak." Tupper advised Koenig that he would call upon him to arrange a meeting in Columbia to "discuss these matters in detail."

Shortly thereafter, in early June of 1978, Tupper called Richard Koenig and met with him at the station facility. They inspected the station facilities and discussed at length the possibility of a sale of Channel Seventeen, including the manner by which the payment of a brokerage fee could be handled.[4] In addition, Koenig provided Tupper with exhaustive information of a confidential nature relating to the financial structure of the corporation. The information included a projection of the cash flow of the corporation through the year 1982; financial statements for the years 1975, 1976 and 1977; balance sheets for the years 1975, 1976 and 1977; statements of income and expenses through December 31, 1977; and a profit and loss statement for the years 1975, 1976, and 1977. Tupper advised Koenig that the financial information would be used to analyze the financial position of Channel Seventeen and "would be incorporated in a file ... for distribution to a prospective buyer of a television station." Koenig expressed concern that the information he provided, intended primarily for the internal use of Channel Seventeen, would not be as appealing to a prospective buyer as it might be. But Tupper assured him that the information would be disseminated accurately to potential buyers and the value

3. The brothers Koenig have both asserted that Tapeswitch, rather than Robert Koenig, is the owner of the minority interest in Channel Seventeen. However, this assertion, as many others made by the brothers, is highly suspect. Throughout the existence of the corporation, the brothers uniformly represented to outsiders, including the general public, the Federal Communications Commission, industry publications, and most importantly, officers of Wooster, that Robert Koenig owned the 45% minority interest in Channel Seventeen. In fact, it was not until September of 1979, the month following the commencement of this action, that the brothers changed the Federal Communication Commission listing to show Tapeswitch, and not Robert Koenig, as an owner of Channel Seventeen. In virtually all business dealings, Richard Koenig considered "Tapeswitch and Robert [as] synonymous" in that "[Robert made] no differentiation between his power over Tapeswitch or his 45 percent." In fact, as late as September 4, 1979, in a sworn affidavit executed before a notary public, Robert Koenig asserted that he was a "45% owner of Channel Seventeen, Inc. with 50% voting control ..." and that he would "take whatever legal action ... necessary" in order "to protect my ownership position." At the time of the events in issue, Tapeswitch itself was owned by Robert Koenig and his wife, Sonja, now deceased. Tapeswitch has admitted herein that Robert Koenig was authorized to act on its behalf throughout the period of negotiations between Wooster and Channel Seventeen.

4. Concerning this meeting, Richard Koenig testified that Tupper had introduced himself "as a C.P.A." and that "in an effort to get a freebie appraisal" Koenig gave Tupper the confidential financial information of the corporation. In this respect, Koenig has attempted to portray himself as a reluctant, totally unknowledgeable seller, who was unsure of the purpose of Tupper's visit. But that portrayal simply is not credible in light of the circumstances. For example, Tupper's letter of May 18, 1978, clearly conveys that Tupper represented clients interested in the purchase of Channel Seventeen and that the purpose of his visit was to discuss a purchase and sale of the television station. The entire thrust of their initial meeting, as related by Tupper, was to discuss a possible sale of the station to his client. It is unbelievable that Koenig, a businessman who had built a business operation worth several million dollars, did not understand the purpose of Tupper's meeting.

of the station would not be minimized. The two also discussed a price for the station, with Koenig estimating its value at $2,500,000 and Tupper increasing that price to $2,600,000 to include a brokerage fee. Regarding the physical facilities of the station, Richard Koenig represented to Tupper that the transmitter site upon which the station was located was leased from the only other shareholder of the corporation and that it would be included in a sale of the corporate assets.

Following their meeting, Tupper again wrote Richard Koenig on June 21, 1978, to discuss methods by which the brokerage fee could be handled and to state that "the Wooster Republican Printing Co. [was] the ideal buyer for [Koenig's] property." Then again, on June 30, 1978, Tupper wrote a letter to Koenig, this time outlining a schedule of payments for a sale of the station for $2,500,000, discussing the tax consequences of such a sale, and making preliminary arrangements for a visit by "principals of the Wooster Republican Printing Co." and himself.

Based upon the general and financial information provided by Richard Koenig during their initial meeting, Tupper prepared a thirty-three page "file," or brochure concerning Channel Seventeen, including its markets, its corporate structure, its finances, its audience ratings, its daily programming, and its physical facilities. Tupper contacted Timothy Dix, secretary and general counsel of Wooster, both by telephone and by correspondence, to convey this information. By letter of July 6, 1978, Tup-per forwarded the "Kepper file" to Dix, along with a capsule summary of the television station and its growth potential.

On July 10, 1978, Timothy Dix, acting as secretary for Wooster, wrote Richard Koenig directly to indicate that Tupper's material had impressed him, that the board of Wooster would be considering the potential acquisition of Channel Seventeen, and that he and Tupper would meet with Koenig during the month of August, 1978.[5] At the time, the directors and shareholders of Wooster[6] had expressed an interest in moving into the television business in order to diversify the corporate media holdings. Timothy Dix was directed to visit the station, to review the situation, and to report to the directors of Wooster with a recommendation as to whether or not the corporation should proceed toward the acquisition of Channel Seventeen.

Timothy Dix, John Tupper, and Richard Koenig met during the last week of August, 1978, in Columbia, Missouri. Dix was introduced as a potential buyer and the purpose of his visit was clearly to survey and discuss the corporate assets of Channel Seventeen for potential acquisition by Wooster.[7] The three men discussed the operations of the station and its potential. Koenig led Dix upon a tour of the station facilities which were then located in the Tiger Hotel in Columbia. Dix also visited the transmitter site, located approximately 18 miles from downtown Columbia in rural Moniteau County, Missouri. Through their discussions, "Koenig indicated [to Dix] that he was definitely interested in seeing that the

---

5. During the trial, Richard Koenig could not recall having received the letter of July 10, 1978, from Timothy Dix. The letter was introduced into evidence.

6. Wooster is owned and operated by members of the Dix family. The older generation of the family comprises its board of directors—Raymond E. Dix is its president and chairman of the board; Albert Dix, is a vice president and a director; Robert C. Dix, is its treasurer and a director; and Gordon Dix is a vice president and a director. Five other family members sit on the board. Timothy Dix, the person primarily responsible for the negotiations for the acquisition of Channel Seventeen, acts as the corporate secretary and general counsel. All of the stock of the corporation is owned by family members.

7. Here again, Richard Koenig denied knowledge of the purpose of Timothy Dix's visit, despite substantial evidence to the contrary indicating that he was fully aware that Dix was representing a potential buyer which had expressed more than a passing interest in the acquisition of the television station. Both Dix and Tupper uniformly testified at trial that Dix visited the station as a prospective buyer and that his purpose was made clear to Koenig. The letters of July 10, 1978 and June 30, 1978, corroborate that testimony.

station was sold and placed in the hands of new operators." They discussed the price of the station and Koenig indicated it would be available for $2,600,000. He also represented to Dix that he was 55% shareholder of Channel Seventeen, that his brother Robert Koenig held the remaining 45% of the corporate stock, and that each "wanted different types of pay out" for their respective interests. No offer was made by Dix at that time to purchase the stock or assets of Channel Seventeen.

No negotiations occurred between representatives of Wooster and Channel Seventeen immediately after the August meeting. However, during this period of time, John Tupper and Richard Koenig discussed the acquisition of a new building for the station. On September 1, 1978, approximately one week after the August meeting, Tupper wrote Koenig to state that the purchase of a new building "appear[ed] to be an advisable move" and to urge Koenig to sign a written and exclusive authorization to sell the stock of Channel Seventeen. Koenig did not sign such an authorization.

In September of 1978, John Tupper met with Richard Koenig in Columbia. Koenig related that his brother, Robert, had visited the station on the prior weekend, and that they both agreed that their acquisition of a new building had materially enhanced the purchase price of the station. Koenig indicated that the station should bring $3,300,-000 instead of the $2,600,000 which had been quoted a month earlier. Koenig suggested that Tupper discuss the matter with his brother over the telephone. Tupper did so. During the course of the telephone conversation, Tupper indicated to Robert Koenig that it would "be difficult to obtain

a buyer to pay that price at that time." Robert, in turn, "related ... that he felt that the value of the building enhanced the value of the company above and beyond the price that they had paid—paid for the building, and he felt that the company was then worth $3,300,000 ..." Robert also told Tupper "that he would take, and he said yes, said he would be willing to sell the company for $3.3 million." After the telephone conversation concluded,[8] Richard Koenig "related [to Tupper] ... that Bob would go along with his wishes insomuch as he was in the driver's seat, so to speak, in running the company." Shortly after his visit, Tupper prepared an updated sales brochure based, in part, upon confidential information provided by Richard Koenig. This new brochure indicated that the sales price of the station would be $2,990,000 and that a purchaser would be responsible for payment of the brokerage fees.

Following his meeting with Richard Koenig and his telephone conversation with Robert Koenig, Tupper relayed the change in purchase price to Timothy Dix. At the September board meeting of Wooster, Timothy Dix recommended that the corporation should give serious consideration to the purchase of Channel Seventeen. However, because of the increase in the price of the station and Wooster's negotiations in other areas, no immediate authorization was given to proceed toward the acquisition of Channel Seventeen. After the board meeting, Timothy Dix communicated with Tupper who told him that, because of the impending transfer of the station facilities to a new building, he had advised Richard Koenig "to take the station off the market, and then consider a sale at a later time."[9]

8. Robert Koenig testified that he could not recall having had this telephone conversation with John Tupper. As he put it, he was "having trouble with the '78." Despite this failure of recollection in this and in other respects, he could remember that he gave his brother advice "to not sell it period" and "certainly not to people he felt he was locked in with." Robert Koenig's testimony was not believable.

9. Tupper had also received word from other of his clients that Channel Seventeen "had been offered on the street" by another brokerage

firm, Bankers Trust. In his testimony at trial, Richard Koenig, always the reluctant seller, admitted that another broker "popped in" to tour the station. He denied, however, that the station was ever listed by another broker, that he intended to sell the station, or that it had been shown to any other prospective buyers. Tupper sent two other prospective buyers through the station, but "they felt that based upon what monies were needed to be put into the company that the price was high."

In October of 1978, Albert Dix, vice president of Wooster, asked Fred Osler, his friend and then general manager of a Louisville, Kentucky television station, to visit the station facilities of Channel Seventeen to make an expert assessment of the station. On October 10, 1978, Osler traveled to Columbia and spent approximately five hours with Richard Koenig touring the station and discussing the program, promotion and production aspects of the station. Upon his return, Osler submitted a written report to Albert Dix, indicating that the station was "woefully weak in marketing, programming, promotion and production expertise" and that its "basic structure [was] weak." He further reported low advertising charges, weakness in sales promotion and packaging, unsophisticated programming, and inadequacy in equipment. He did advise, however, that the operation of Channel Seventeen could be improved to achieve significant financial success. This report was circulated to members of the board of Wooster.

Wooster remained interested in the acquisition of Channel Seventeen. But during the fall of 1978, it was engaged in negotiations concerning an acquisition contract which it had earlier executed for the purchase of a UHF television station in Layfayette, Indiana.[10] Apparently, difficulty had arisen in the acquisition of that station due to the inability of the seller to transfer clear title. Eventually, Wooster withdrew from the contract and took back an earnest money deposit which it had made.

*The Contract Negotiations*

No further steps were taken by Wooster toward the acquisition of Channel Seventeen until the spring of 1979, when the board of directors, during its meeting of May 31, 1979, authorized Timothy Dix "to attempt to acquire substantially all the assets of Channel 17 . . . for up to 3.5 million dollars, including commitments for working capital brokerage fees, and actual costs and assets . . ." This resolution by the Wooster board came as a result of earlier board discussions and conversations between Timothy Dix and John Tupper regarding the Koenigs' willingness to enter into an "asset transaction" for "3.3 million dollars." [11]

John Tupper arranged for representatives of Wooster to visit Richard Koenig at the station on June 8, 1979. He suggested to Timothy Dix that he prepare a letter of intent prior to the meeting, which Dix prepared. Albert Dix, Raymond Dix, Timothy Dix, John Tupper, Richard Koenig and Thomas Koenig [12] met in Columbia in the new office building of Channel Seventeen to discuss the terms of the sale of the company.[13]

Following an initial tour of the new building by the Wooster representatives, the parties fully discussed the sale of the assets of Channel Seventeen to Wooster. During those discussions, Richard Koenig appeared anxious and willing to consum-

**10.** Channel Seventeen contends that the failure of Wooster or John Tupper to reveal this transaction, or Tupper's involvement in it, somehow violated a duty owed to Channel Seventeen. But the evidence clearly demonstrates that Richard Koenig was, at all times, apprised of the fact that Tupper represented Wooster as its broker and that his fee would be paid by Wooster. Channel Seventeen cites no authority for the proposition that Tupper was bound to reveal his participation in the earlier attempt on the part of Wooster to acquire another station, or that such transaction had occurred. Moreover, it is unclear how this revelation would have altered the negotiations between Wooster and Channel Seventeen since the earlier attempted purchase was totally unrelated.

**11.** Originally, Dix had discussed a purchase of Channel Seventeen stock by Wooster or one of its subsidiaries. The "asset transaction" concept was a new approach, involving the sale of Channel Seventeen's assets rather than its stock. According to Timothy Dix, "this was a change that was totally generated from Channel Seventeen." Wooster would have preferred the former approach.

**12.** Thomas Koenig is Richard Koenig's son. He was and is employed by Channel Seventeen as his father's "right-hand-man."

**13.** Despite strong and uniform evidence to the contrary, Richard Koenig testified at trial that Wooster representatives "were only welcomed in to discuss the potential purchase" and that he did not attach any significance to the meeting.

mate the sale. He did not indicate to the Wooster people, or for that matter any one else, that his brother was reluctant to sell the station. Nor did he ever indicate to those Wooster representatives that the minority interest in Channel Seventeen was owned by Tapeswitch rather than his brother.

The parties utilized the draft letter of intent, prepared prior to the visit by Timothy Dix at the suggestion of John Tupper, as a platform for their negotiations. As originally drafted, that letter left the purchase price of the station as an open item for negotiation. It did, however, set out several provisions with concreteness and clarity. One of those provisions established that the "allocation of the purchase price to assets" would reflect a full assumption of tax liability by Channel Seventeen "for all taxes related to recapture of depreciation and investment tax credits." In addition, the letter indicated, among other things, that adjustment would be made for increases or decreases in the assets of Channel Seventeen; that certain prorations would be made for rent, real and personal property taxes and other items, that liens and other encumbrances would be cleared, and that a $50,000 escrow deposit would be made as earnest money with an immediate $10,000 deposit with Kepper, Tupper & Company. A final sales agreement was to be prepared "within ten days to two weeks."

In the course of the discussions, Albert Dix expressed concern that a continuity of management be established at the station following the sale. Thus, despite Richard Koenig's initial representations that he was "going to take part of his money and travel," he was asked by the Wooster representatives to remain available for consultation. To achieve that purpose, a clause was added to the letter of intent to pay Richard Koe-

nig the sum of $75,000 over a three-year period of time as a part of the purchase price. Most importantly, a purchase price of $3,225,000 was established, with a requirement that Wooster deposit the sum of $50,000 with an escrow agent, $10,000 of which was to be deposited immediately with Kepper, Tupper & Company. Although Richard Koenig stated that this agreement "was not quite what they were looking for" in terms of price, the "offer was very marginal in difference and thus the offer was acceptable ..." [14] Richard Koenig signed the letter of intent as president of Channel Seventeen. Raymond Dix signed it as president of Wooster. On June 12, 1979, Wooster deposited $10,000 with the escrow agent as an initial payment of earnest money.

On June 12, 1979, John Tupper wrote Richard Koenig to outline the tax consequences of the agreement which had been set forth in the letter of intent. That letter came as the result of a telephone conversation between Koenig and Tupper concerning the matter. The next day, on June 13, 1979, Tupper wrote Timothy Dix to suggest an allocation of the proposed purchase price to assets and to explain the tax consequences of that allocation. Tupper proposed an allocation of 60% to 65% of the total purchase price to the assets, an allocation which was reasonable by industry standards.

By letter of June 22, 1979, Timothy Dix forwarded copies of a proposed contract to Richard Koenig. He indicated that the proposal was "a vehicle to engage in a full discussion of the status of the station and its assets," that "everything in the contract [was] negotiable," and that any problems in the contract could be resolved by working with Koenig's attorney.

On the same day, however, Robert Koenig visited his brother at the station. Robert Koenig was aware that Richard Koenig

14. Although Richard Koenig admitted that he had negotiated and signed the letter of intent, he testified that he considered the "document ... doomed to failure from the time it was drawn up" and that he had "tolerated [the Wooster representatives] to come in and burden [him] with this offer ..." He further testi-

fied that he signed the letter, not in good faith, but "knowing it was void." A tape recording was made by Richard Koenig of this meeting. However, although it was requested in pretrial discovery, it was not produced and it was not introduced into evidence.

had been negotiating for the sale of the station to Wooster and that Richard was determined to consummate the sale.[15] During their meeting, Richard advised Robert that the consulting fee arrangement which he had struck with Wooster in the June 8th letter of intent "was of no consequence." Apparently, the Koenigs also discussed the price of the station for, shortly thereafter, Richard Koenig telephoned John Tupper to tell him that Robert would not accept the figure agreed upon of June 8th, but "that they would accept $3.3 million."

Immediately after learning of the Koenigs' new demand, Tupper called Timothy Dix to communicate it to him. Dix, in response, indicated that he would have to discuss the matter with the Wooster board.

Timothy Dix subsequently advised John Tupper that Wooster would agree to the increase in price and that it would offer $3,300,000 for the assets of Channel Seventeen. However, as a condition to any further negotiations by Wooster, Dix insisted that he be provided with written documentation which demonstrated that all the shareholders of Channel Seventeen had agreed to the sale of the corporation at that price. As Timothy Dix stated it, the purpose of this document was to insure "that 100 percent of the shareholders, the two brothers, had accepted the transaction as well as the corporation" and to provide evidence of that unanimous acceptance before he "spent the time and effort to go back to Columbia or spent any time redrafting contracts."

To that end, Timothy Dix drafted a formal letter of commitment which presented the offer of $3,300,000 by Wooster for the assets of Channel Seventeen and generally outlined the basic conditions of the agreement including provisions for an earnest money deposit, an allocation of the purchase price to the corporate assets to reflect an assumption of Channel Seventeen of tax liability for depreciation recapture, an adjustment of increases or decreases in existing assets, warranties, and other miscellaneous matters. That letter clearly indicated that Wooster's counsel would prepare a proposed sales agreement to be submitted to Channel Seventeen "within a few days." That letter, dated July 2, 1979, was mailed to Richard and Robert Koenig on the same day.[16] It required the acceptance, by signature, of both men, as shareholders of Channel Seventeen, and of Richard Koenig, as president of the corporation. The letter had been signed by Timothy Dix as representative of Wooster.

About this time, on approximately June 22, 1979, Robert Koenig employed a media broker, James Blackburn, to visit the station facilities of Channel Seventeen to appraise the fair market value of its assets.[17]

---

15. Richard Koenig's testimony concerning this visit serves as a graphic example of the total lack of credibility of the testimony of the brothers Koenig. Richard testified that he "did not pursue or discuss or do anything about that June 8th [June 9th] aborted situation" with his brother during the June 22nd visit. However, moments earlier, he testified that he might have discussed the consulting fee provision of the June 9th proposal during his brother's visit. It defies belief that the consulting fee was discussed during the visit, but not other aspects of the June 9th negotiations, particularly in view of the magnitude of the financial aspects of the proposal. Moreover, Robert Koenig testified, in direct contradiction to his brother, that the purpose of the visit was to discuss the sale of the station to Wooster. The fact that a new and revised purchase price was relayed to John Tupper, the broker, within a day or two of the visit stands as a strong indication that the brothers fully discussed the impending sale of the station at this time.

16. On the day the letter was prepared and sent by Timothy Dix, he had not been informed of the existence of Tapeswitch or that Tapeswitch was a purported shareholder of Channel Seventeen. In fact, at this time, representatives of Wooster had always been led to believe that Robert Koenig was the minority shareholder of Channel Seventeen.

17. In direct examination, Robert Koenig testified that he was first notified that his brother was negotiating with Wooster in July of 1979 "before Blackburn" was employed. But he later recalled having seen correspondence dated June 12, 1979, concerning the tax aspects of the proposed sale. Moreover, Blackburn testified that his firm was retained by Robert Koenig "ten days prior to July 2nd," apparently the same day Robert travelled to Columbia to visit the station. Blackburn assumed that the purpose of his appraisal was to assist in an impending sale of the station.

Blackburn met with Richard and Robert Koenig at the station on July 2, 1979. Richard Koenig had not been informed of the prospective meeting until Blackburn arrived. During the meeting, Blackburn toured the facilities, discussed the station operations with the Koenigs, and gathered financial information. He also visited the tower site. Robert Koenig advised Blackburn that he owned the land upon which the tower stood and that, upon a future sale of the station, he would deed the land over to a purchaser, along with an easement.

On July 5, 1979, Blackburn telephoned Robert Koenig and advised him that the station had been appraised at $3,300,000. Koenig expressed surprise "at that exact figure," apparently because it so closely approximated the amount offered by Wooster in the June 9th letter of intent negotiated by Richard Koenig. Koenig later called Blackburn to question him about the methodology employed in the appraisal and to question him as to whether or not he had discussed Channel Seventeen with anyone outside his brokerage firm. Blackburn's appraisal fee was later paid by Tapeswitch.

Sometime after Blackburn's visit to the station facilities in Columbia, Richard and Robert Koenig received the three-page commitment letter which had been drafted by Timothy Dix outlining the essential terms of Wooster's increased offer to purchase the assets of Channel Seventeen. Again, it should be noted that the commitment letter required the acceptance of all of the shareholders of Channel Seventeen, including Robert Koenig, and that it specifically apprised the Koenigs that Wooster expected an allocation of the purchase price which would result in the full recapture of depreciation and investment tax credits.

On July 11, 1979, Richard Koenig telephoned his brother to urge him to sign the commitment letter tendered by Timothy Dix. Prior to that conversation, Richard Koenig had fowarded to Robert Koenig a draft of the proposed sales agreement, a draft which was substantially similar to the agreement which was ultimately consummated. Robert Koenig had read that proposed agreement and "made some observations concerning it." [18]

At this time, Robert Koenig knew the essential terms of the proposal. Based upon the materials which he had received from his brother and Timothy Dix, he had been fully alerted to the tax consequences of the proposed sale. He knew the proposed purchase price, a figure which equaled the fair market value of the station as established by his own appraiser. He knew the essential terms of the proposal. He knew that shareholder authorization was a prerequisite to any further negotiations by Wooster. He knew that his signature represented his acceptance of the essential provisions of an agreement to sell the assets of Channel Seventeen. He knew his signature authorized his brother to negotiate a final sales agreement consistent with the terms of the commitment letter. He signed the letter.[19] That letter was then forwarded to Richard Koenig who later advised John Tupper that it had been signed by his brother and that he possessed it. Tupper, in turn, contacted Timothy Dix to confirm that the letter had been signed by Robert Koenig and that it would be

18. In his testimony at trial, Robert Koenig minimized his review of the proposed contract, a contract which contained most of the essential terms of the final contract signed by his brother. As he put it, he "glanced at it." However, it is difficult to believe that Robert's consideration of the proposal was as cursory as he represented it to be, particularly in light of his other actions during this time frame and the financial magnitude of the proposal. He had visited the station twice, had conversed with his brother several times, and had been responsible for the appraisal of the station by an independent broker. These were not the actions of a disinterested bystander.

19. Here again, it should be noted that Robert Koenig was fully authorized by Tapeswitch, as its president and substantial stockholder, to approve the sale. As earlier indicated, Tapeswitch had admitted Koenig's authorization for all actions taken by him during this period of time.

tendered to Dix upon his arrival in Columbia to finalize the contract.[20]

Timothy Dix, Albert Dix, and John Tupper met with Richard Koenig and his attorney, Cullen Cline,[21] about 10:00 a.m. on July 17, 1979, at the offices of Channel Seventeen. The negotiations began at that time and proceeded throughout the day until about 4:00 p.m. During that period of time, the parties negotiated the essential terms of the purchase agreement which were embodied in a thirty-six page, comprehensive agreement for the sale of Channel Seventeen for the purchase price of $3,300,-000. These negotiations consisted primarily of a page-by-page, provision-by-provision discussion of the proposed contract which earlier had been provided to the brothers by Timothy Dix.

Throughout the negotiations, Richard Koenig questioned various contract clauses and provisions and sought advice from his attorney. Not only did he participate, but "he had a whole list of questions and comments and marginal notes that he had made on the draft that [Timothy Dix] had sent [on] July 6th." Cline also actively participated in the contract negotiations, answering Richard Koenig's questions, offering suggestions concerning the substance and form of the agreement, and negotiating various contracts negotiations. Revisions in the agreement were made upon Richard Koenig's request.

One of the topics of discussion was the continued employment of Richard Koenig's son, Thomas, as the general manager of Channel Seventeen. The parties unanimously agreed that a separate agreement should be made between Wooster, Channel Seventeen, and Thomas Koenig. A letter, encompassing the terms of an employment agreement, was prepared and executed by Albert Dix, as representative of Wooster.

Another topic of brief discussion was the provision of the contract which provided for the remedy of specific performance and acknowledgement by the seller that damages at law would be inadequate. The parties discussed the "mechanical aspects" and Richard Koenig was advised that Wooster "required the right of specific performance if [it was] going to enter into [the] contract." The provisions were negotiated to a certain degree and Richard Koenig was advised that the provision "would allow [Wooster] to compel Channel Seventeen to sell its assets to [it], if [Channel Seventeen] executed and delivered [the] contract."

The negotiations of July 17th ended at about 4:00 p.m. after the parties had covered all the provisions of the thirty-six-page contract. Albert Dix signed and executed the document at that time as the representative of Wooster.[22] However, Richard Koenig did not sign it then. Koenig had tape recorded the majority of the contract negotiations during the day. He desired to remain at the station in order to review those proceedings and indicated to Timothy Dix that, "this is my last crack at making a decision of whether or not to go forward."[23] Dix responded, "If you have any doubts at this time you ought to think this thing

**20.** This notification was crucial to any further negotiations by Wooster for Timothy Dix had clearly stated to John Tupper that he would not come to Columbia until the commitment letter was signed by both brothers because he "did not want to run into a situation where we were constantly renegotiating everything."

**21.** In the past, Channel Seventeen had utilized the services of Forbes Blair, a Washington, D. C., attorney who specialized in communications law. However, Channel Seventeen had also retained Cline in prior instances. Here, however, in an effort to minimize legal expenses, only Cline was consulted by Channel Seventeen for the purpose of negotiating the contract. Again, it should be noted that both Richard and Robert Koenig had been provided with copies of the proposed contract well before the July 17th meeting.

**22.** Albert Dix left Columbia on July 17th. However, he signed the signature page of the contract prior to his departure. It was agreed that Timothy Dix would attach that signature page to the final contract.

**23.** Thomas Koenig testified that his father and his uncle, Robert Koenig, communicated with each other by telephone during the negotiations of July 17th and 18th. In light of the circumstances, it is highly unlikely that they did not discuss the negotiations which were then in progress.

through and really satisfy yourself that this is really what you want to do because once we conclude the transaction by signing it, we expect to go through with it."

There were other tasks which remained to put the written contract in final form. Both Richard Koenig and Cullen Cline, his attorney, had expressed concern about the tax consequences of the allocation of the purchase price to be made to the assets of Channel Seventeen. Cline wished to review that situation with John Tupper and the accountant of Channel Seventeen, Charles Murphy. Moreover, Timothy Dix and Cline were to "finalize" the language of the contract pursuant to the agreements of the parties. The contract was put into final form at Cullen Cline's office on the evening of July 17, 1979 with the exception of certain schedules and exhibits that were to be attached to the contract.

One section of the final contract which differed from the earlier proposed contracts which had been sent to the brothers Koenig was the signature line. Timothy Dix wanted assurances that he could verify authorization of the sale by all Channel Seventeen shareholders. He did not have the commitment letter of July 2nd in his possession at that time. Dix asked Cline whether or not it was necessary to continue to have the shareholder approval sections in the contract. Cline indicated, in response, that "he understood there was a letter and he also reported to [Dix] that he knew the parties had been together and that they had discussed the transaction—the parties meaning Robert and Richard Koenig—and that from that, he knew that the full discussion had taken place and Robert had signed it, and he agreed that he didn't think that the shareholder approval section was necessary." With that representation by the attorney of Channel Seventeen, the signature section of the contract was altered to reflect the signatures of the corporate representatives of both corporations.

The following morning, on July 18, 1979, Cullen Cline and Charles Murphy, an accountant retained by Channel Seventeen, met to discuss the tax consequences of the proposed sale and the allocations of purchase price to be attached to the contract. Cline was concerned that the sale might result in a "double taxable event" for the Koenigs. Cline telephoned Tupper and requested that he meet with them to explain the tax structure of the sale. After reading portions of the tax code to them, Tupper indicated his feeling that the sale would be considered a "337 liquidation" which would not result in double taxation. His explanation satisfied Murphy who also stated that the allocations which had been set forth were acceptable to Channel Seventeen. After the meeting with the accountant of Channel Seventeen, Cline and Dix spent the remainder of the morning typing the schedules which Richard Koenig had provided.

Before meeting with Cline to finish assembly and execution of the final contract, Timothy Dix and Richard Koenig had met at the station offices to compile the exhibits and schedules. At that time, Dix informed Koenig that the commitment letter which had been signed by his brother, as minority shareholder, would have to be provided before the final execution of the contract. Richard Koenig produced the document, signed it himself as shareholder of the corporation, and tendered it to Dix. This occurred approximately 45 minutes before the group assembled in the offices of Cullen Cline to execute the contract.

At about 1:00 p.m. on the afternoon of July 18, 1979, Richard Koenig signed the contract as president of Channel Seventeen. Just prior to that signature, Timothy Dix explained to him that the signature section of the contract had been changed and that "the shareholder assent or consent or approval section" had been removed. At the time, Dix had been provided with the letter of commitment which had been signed by Robert Koenig, as minority shareholder of Channel Seventeen. He asked Richard Koenig whether or not the alteration created any problem and, in response, Richard

Koenig "affirmatively indicated that there was none." [24] Cullen Cline confirmed that his client had been fully advised of the change.

At the time Richard Koenig signed the agreement, he believed that it did not contain any untrue representations of provisions. The document itself contained statements that Channel Seventeen had authority to enter into the transaction and that the agreement and transactions contemplated by the agreement had been duly authorized and approved by all of the shareholders of Channel Seventeen. Additionally, it required that a document be delivered to Wooster indicating that the sales transaction had been duly authorized and approved by the shareholders of Channel Seventeen. The commitment letter, signed by both Koenigs as shareholders and Richard Koenig as president of Channel Seventeen, fulfilled that requirement and represented authorization for Richard Koenig, as president of Channel Seventeen, to negotiate, finalize and execute the sale of the corporate assets consistent with the terms of the letter. In that respect, there is nothing contained within the final contract, executed on July 18, 1979, by Richard Koenig which is inconsistent with the terms outlined in the letter of commitment dated July 2, 1979.

*Events Following the Execution of the Contract*

The day following the execution of the contract, Wooster deposited the sum of $40,000 with Kepper, Tupper and Company, as escrow agents. This sum was in addition to the $10,000 previously deposited with John Tupper in June by Wooster, and it completed the full deposit of the earnest money required by the contract. That sum of money remained on deposit with the escrow agent throughout the pretrial proceedings in this cause, and it was so deposited at the time of trial.

On August 6, 1979, Albert Dix and Steven Dix traveled to Columbia to assemble certain public questionnaire information required by the Federal Communication Commission as part of the license application by Wooster. During that time, the two met with Richard Koenig and his son who suggested certain names of community leaders for the required ascertainment study. Neither Richard Koenig nor his son indicated in any way that any problem had developed in the performance of the contract by Channel Seventeen.[25] To the contrary, Richard Koenig gathered the employees of the station to meet the Wooster representatives and to advise them that a sale had occurred. On August 8, 1979, Richard Koenig entered into a separate agreement with Albert Dix, as representative of Wooster, to allow Koenig "to hang some of [his] equipment on the [station] tower" in return for its maintenance. And during the visit, the Wooster representatives were shown a copy of an advertisement which was to be placed in the local newspaper by Thomas Koenig, as general manager of the station, announcing Wooster as the purchaser of KCBJ–TV. That advertisement appeared in the newspaper on August 10, 1979.

Approximately one week after the visit of Albert and Steven Dix to the station in Columbia, Missouri, Richard Koenig traveled to Colorado Springs, Colorado and met

**24.** Despite substantial evidence that Richard Koenig placed great significance in the fact that his brother had signed the commitment letter and that he affirmed the alteration of the signature section of the final contract, he testified at trial that there was never any doubt in his mind that Robert's signature on the contract was necessary.

**25.** The Koenigs testified at trial that Richard first advised his brother of the contract on July 20, 1979. Richard testified that Robert "was very disappointed that [he] would have gone as far as [he] did," but that his brother was not concerned because neither felt a contract existed. Robert, on the other hand, testified that he "became furious that he would do such a thing." But the significance of this testimony is substantially dissipated by two facts. First, Robert never made any effort to convey his alleged objections to the contract to Wooster. And second, the actions of Richard, at least as far as they involved Wooster representatives, were those of a seller who believed a valid contract had been executed and would be performed.

with Timothy Dix[26] in the coffee shop of the Antlers Hotel. Koenig desired to discuss several matters pertaining to the sale of Channel Seventeen, including the impact of a new business venture which he proposed. Apparently, Koenig did not indicate to Timothy Dix that Albert Dix had already executed an agreement which permitted Koenig to place certain two-way communications equipment upon the television tower, but instead wanted the independent reassurances of Timothy Dix that he could do so. Not knowing of the earlier commitment by his uncle, Timothy Dix advised Koenig that he would have to obtain approval from the Wooster board. Koenig addressed other matters concerning the sale, but did not indicate that any problems had arisen in the performance of the contract, or that his brother had expressed any objections to it. Instead, Koenig seemed "still happy about the transaction" and related that they were "looking forward to getting the application finished and closing the transaction."

Five days after his visit to Colorado Springs, and a month after he had signed the contract, Richard Koenig met with his brother at Lambert Airfield in St. Louis, Missouri, ostensibly for a meeting of shareholders of Channel Seventeen. The stated purpose of the meeting was "to consider ratification of [the] contract . . . to sell all of the Corporation's assets." Robert Koenig, acting on behalf of his corporation, Tapeswitch, asserted that he had not authorized the contract. On the other hand, Richard Koenig, speaking as president of Channel Seventeen, "stated that Robert Koenig had given his consent to the sale of the Corporation's assets in a letter from the Wooster company."[27] Robert reviewed the

contract and reported that "he considered that various provisions of the contract were not advantageous to the Corporation." Although he demanded that Wooster be notified that the contract "be considered null and void," he would not discuss the perceived deficiencies of the contract and a resolution was made by the brothers to the effect that the contract would not be honored.

On August 21, 1979, Timothy Dix received a mailgram from Richard Koenig, acting as president of Channel Seventeen, which advised him that "[i]n a special Channel 17 corporate meeting, [a] decision was made to reject the proposed sales agreement of July 18, 1979" and that "there will be no sale." Both brothers, each acting in his executive capacity with Channel Seventeen, also forwarded a letter dated August 20, 1979, to Raymond Dix, president of Wooster, notifying him that "Channel Seventeen, Inc., does not recognize and cannot honor the document of July 18, 1979 proposing the sale of KCBJ–TV" and that "the proposed transfer [would] not be pursued by Channel Seventeen, Inc., which [would] continue to operate KCBJ–TV." By these actions, both brothers, Richard and Robert Koenig, as shareholders and officers of Channel Seventeen, intended to completely and totally repudiate the contract of July 18, 1979. That decision was not made until August 19, 1979, at their meeting in St. Louis, Missouri.

The mailgram announcing the repudiation of the contract by Channel Seventeen was received with surprise by Timothy Dix. He attempted to reach Richard Koenig by telephone, but could not. The next morning Dix arrived in Kansas City and at-

26. Timothy Dix lives and maintains a law office in Colorado Springs, Colorado.

27. At trial, both brothers denied that Richard Koenig made this statement. But here again, these denials demonstrate the equivocation and lack of credibility of their testimony as a whole. The statement prominently appears within the written minutes of the purported shareholders' meeting which were prepared by Robert Koenig's attorney. Those minutes were acknowledged by the signatures of both brothers.

Moreover, during their depositions and at a hearing upon a preliminary injunction, all occurring many months prior to trial, both brothers admitted that the statement may have been made by Richard Koenig at the St. Louis meeting. Although the brothers unequivocally stated at trial that Richard had never made the above-quoted assertion, they were convincingly impeached by their prior inconsistent statements.

tempted to telephone both Richard Koenig and his attorney, Cullen Cline. He could not reach Koenig. Cline reported that "he had talked to his client, and his client had ... hung up on him." That afternoon Dix finally reached Koenig. Koenig told Dix that the "deal just wouldn't go through;" that he would not meet with Dix to discuss the matter; and that he would not give a reason for the repudiation of the contract. Dix urged Koenig to reconsider the repudiation of the contract. He would not.

By mailgram of August 22, 1979, Timothy Dix, acting as secretary and general counsel of Wooster, advised Richard Koenig that Wooster stood "ready, willing and able to perform its obligations under the agreement" and that unless Wooster "receive[d] written notice from Channel Seventeen, Inc. by the close of business, Monday, August 27, 1979, to the effect that Channel Seventeen [would] retract and abandon the repudiation ... and ... expeditiously perform its obligations under the agreement," Wooster would proceed immediately to enforce its legal remedies. No further word was forthcoming from Channel Seventeen.

The instant action was commenced on August 28, 1979. Despite the willingness and continued ability of Wooster to perform its obligations under the contract,[28] Channel Seventeen has steadfastly refused to do so.

*The Characteristics and Market of Channel Seventeen*

As one expert put it, Channel Seventeen is "a very unique station in itself." It is a UHF station with a national network affiliation which competes with two VHF stations also with national network affiliations.[29] Its network, ABC, had led the industry in audience ratings for several years. The station operates with an exceptionally tall tower which is strategically placed to serve not only Columbia, Missouri, but also Sedalia, Jefferson City, and the surrounding rural areas. It services a market which is youth and government oriented with a high "per family spendable income." One national rating service, Arbitron, has recently upgraded this market from 134th in the nation to 129th. Both Columbia and Jefferson City are stable and growing communities with a high percentage of professionals residing within them.

Despite its strong markets and excellent potential, Channel Seventeen has not achieved the success it could attain. It has "one of the lowest rate cards ... in a market [of its] size," and its potential profitability has not been reached. This failure to achieve full financial potential is the result of a lack of cohesiveness and uniformity in program packaging, an unaggressive sales program and insufficient infusion of working capital. With the proper management, however, the station could achieve a high degree of profitability.

Because of the failure of Channel Seventeen to reach its potential, it is one of the few television stations in the nation which would sell for under $5,000,000. There has been no contention herein that $3,300,000 was not a fair price for the assets of Channel Seventeen on July 18, 1979. To the contrary, the testimony at trial uniformly confirmed that this price was at or above the fair market value of Channel Seventeen at that time. The station has, however, since appreciated in value to approximately $900,000 over the price established by the contract of July 18, 1979. The unrefuted expert testimony at trial established the current fair market value of Channel Seventeen at $4,200,000.

*The Transmitter Site and Lease*

As part of the contract executed on July 18, 1979, Channel Seventeen agreed that its

---

28. The corporate officers of Wooster who testified at trial, including its controller, all stated without reservation that Wooster enjoys a financial position which would permit it to perform, on a cash basis, all of its obligations under the contract.

29. Television channels are separated into two classifications: ultra-high frequency and very-high frequency. Very-high frequency stations broadcast between channels 2 through 13. Ultra-high frequency stations broadcast between channels 14 and 81. The UHF channels require considerably more power than the VHF channels. Apparently, the VHF channels appeal to a broader television audience and, for that reason, are valued higher.

assets included "the real property on which are located the antenna(s), transmitters, studio and offices of the Station . . ." Specifically described was the "tower and transmitter site" which consisted of "a one acre tract plus road access, guy wire and anchor easements." The parties acknowledged that "the site [was] owned by Robert H. and Sonja Koenig and Leased" to Channel Seventeen and that Channel Seventeen would be able "to transfer the site or cause it to be transferred in fee" to Wooster.

Throughout the contract negotiations, Richard Koenig represented to both appraisers and Wooster representatives that the transmitter site upon which the station tower was located was owned by his brother and was leased to Channel Seventeen. He further represented to Wooster representatives and the broker, John Tupper, that Robert Koenig would convey the one-acre site to a buyer of the station as part of the purchase price of the station. The same representation was made by Robert Koenig himself to his own appraiser, James Blackburn, in the course of his evaluation of the assets of Channel Seventeen shortly before Koenig signed the letter of commitment of July 2, 1979.

Despite their representations as to ownership of the transmitter site, it was not owned by Robert Koenig, but rather his wife, Sonja.[30] She had leased the site to Channel Seventeen for a period of several years, and more recently under a lease which had been executed as a part of the settlement of a controversy which had arisen between the brothers over control of Channel Seventeen. In 1977, Tapeswitch, Robert's corporation, had brought suit against Channel Seventeen in this Court concerning the ownership of its stock. The minutes of a shareholders' meeting of Channel Seventeen, attended by Richard, Robert, Sonja and Corrine Koenig[31] on January 21, 1977, reflect that a settlement

agreement was ratified and approved by the brothers that day. A signed copy of that agreement was attached to the minutes. It provided, in part, for a change in the voting stock structure of the corporation, the dismissal of the pending suit, a decrease in the number of corporate directors from three to two, and a lease to be executed by Sonja Koenig which provided that:

> The transmitter site for the tower of the Company, located upon a farm owned by Sonja Koenig, will be leased to the Company, Channel Seventeen, for five years from this date at a rental of $300 per month. The Company, at the end of said lease, shall have an option to purchase the one acre site, as surveyed July 29, 1976, by Don M. Griffin, and upon which the tower stands, together with an easement for access and an easement for the placing of anchors and support cables, all for the sum of $10,000. The lease for the demised property shall be assignable to any purchaser of the Company, contain standard provisions, and provide for forfeiture in the event waste is committed upon the farm of which said leased premises are a part. The Company and its agents shall be required to use every reasonable care to prevent damage to the said farm and the improvements therein.

This agreement was signed by both Richard and Robert Koenig, as individuals, and by Robert Koenig, as president of Tapeswitch. Changes had been made within the document, and notably within the lease provision of the agreement, all bearing the handwritten initials of both brothers.

Following this shareholders' meeting, the lawsuit between the corporations was dismissed, Channel Seventeen commenced the payment of $300 per month in rent for the transmitter site, and Corinne Koenig resigned her position as director of Channel Seventeen, a position which remained va-

---

**30.** Sonja Koenig is now deceased. In her will, probated in the State of New York, she bequeathed the transmitter site to her husband, Robert Koenig. Her estate was in probate at the time of trial.

**31.** The minutes of the meeting reflect that it was attended by Richard Koenig, Robert Koenig, and Corinne Koenig, as directors of Channel Seventeen. Richard Koenig testified that Sonja Koenig was present also.

cant, thus leaving two director positions in the Channel Seventeen structure. Accordingly, despite the protestations of the Koenigs to the contrary, the actions taken by them following the execution of settlement agreement clearly indicate that they considered it an effective document in all respects, and most importantly, in its lease provisions.[32]

### The Attorneys Fees of Wooster

At trial, Wooster introduced a summary of its expenses, both legal and nonlegal, related to its attempts to acquire Channel Seventeen. That summary shows expenses incurred both before August 28, 1979, the date of the commencement of this action, and after that date. The summary does not, however, indicate the amount of attorneys fees directly attributable to this litigation; and it does not encompass the attorneys fees and taxable costs incurred by Wooster after October of 1980.

### Conclusions of Law

### Shareholder Approval and Compliance with Section 351.400

Both Channel Seventeen and Tapeswitch assert that no contract exists between Channel Seventeen and Wooster which would bind Channel Seventeen to a sale of its assets. Relying upon the provisions of Section 351.400, Mo.Rev.Stat., they contend

that the approval of Tapeswitch, as holder of 45% of the stock of Channel Seventeen, was necessary as a predicate to the sale. This authorization, they urge, was never given. Additionally, they contend that the failure to follow the other procedures outlined by Section 351.400 is fatal to the contract.

■ The provisions of Section 351.400 provide, in relevant part, that "[a] sale . . . of all, or substantially all, the property and assets, with or without the goodwill, of a corporation, if not made in the usual and regular course of its business," may be made upon "the affirmative vote of the holders of at least two-thirds of the outstanding shares entitled to vote" at a meeting of shareholders.[33] Section 351.400 also provides for notice to the shareholders that the sale has been proposed.[34] This statute, and others like it, are designed primarily for the purpose of protecting the interests of the shareholders of the corporation, particularly those of dissenting shareholders, and they are not based upon consideration of the public welfare. *Beaufort Transfer Company v. Fischer Trucking Company,* 451 S.W.2d 40, 43 (Mo.1970); *Flarsheim v. Twenty Five Thirty Two Broadway Corporation,* 432 S.W.2d 245, 252 (Mo.1968); and *Still v. Travelers Indemnity Company,* 374 S.W.2d 95, 100 (Mo.1963). For that reason,

---

**32.** These matters were provided by the settlement agreement entitled "Memorandum of Agreement." At trial, both brothers were vague about the performance of this agreement with the exception of the lease provision. In that respect, the brothers emphatically asserted that Sonja Koenig had refused to sign the lease and that it had never been executed. Plaintiff could not produce an executed lease, but did introduce the provisions of an unexecuted lease.

Here, as in their other testimony throughout the trial, the assertions of the brothers cannot be believed. The minutes of the shareholders' meeting of January 21, 1977, clearly indicate that the settlement agreement, signed by both brothers, had been executed and was ratified and approved by the directors of Channel Seventeen. Those minutes also state that the lease agreement was "executed by Channel Seventeen, Inc., and Sonja Koenig." Other specific actions were taken in accordance with the agreement, as noted above. Moreover, from this date, and to the time of trial, Channel

Seventeen regularly and consistently paid rent on the transmitter site in the amount of $300. Thus, the objective actions of the brothers and their corporations belie their testimony. The fact that plaintiffs cannot produce an executed lease is not significant in that the custodian of such lease obviously has been one of the brothers or Sonja Koenig.

**33.** Prior to the 1975 amendment of Section 351.400, it required the approval of at least 75% of the holders of voting stock to effect the sale of the corporate assets.

**34.** Section 351.400(1) also provides that the board of directors may adopt a resolution recommending the sale, but that "such proposed sale . . . need not be adopted by the board of directors and may be directly submitted to any annual or special meeting of shareholders." See *Beaufort Transfer Company v. Fischer Trucking Company,* 451 S.W.2d 40, 41 (Mo. 1970).

the failure of the corporate seller to comply with the technical requirements of the statute is not fatal to the sale of its assets as long as the primary purpose of the statute has been achieved.[35] *See Beaufort Transfer Company v. Fischer Trucking Company, supra.*

■ Here, the interests of Tapeswitch were recognized and its approval of the sale, in writing, was secured prior to the execution of the contract of July 18, 1979. As a preliminary matter, it should again be noted that Robert Koenig, as president and primary stockholder of Tapeswitch, was fully authorized by his corporation in all acts he performed concerning the sale of the assets of Channel Seventeen. That fact has been conceded. Thus, regardless of the true ownership of the minority interest in Channel Seventeen, be it that of Tapeswitch or Robert himself, his actions bound his corporation. Clothed with that authorization, Robert Koenig gave his approval for the sale of the corporate assets of Channel Seventeen. That approval was given in the form of the commitment letter, dated July 2, 1979, in which he accepted, in writing, the sale of the corporate assets for $3,300,000. At the time of his signature he had been provided with a proposed draft of the contract, one which was very similar to that which was ultimately executed, and he was fully aware of the basic and essential terms of the sale, its tax consequences, and that the commitment letter authorized final negotiation by his brother, as chief executive officer of Channel Seventeen. Moreover, he was aware of the contract negotiations of July 17th and 18th, communicated with his brother as they progressed, and did not voice his objections. In fact, no objections were articulated to Wooster concerning the contract, either by Richard or Robert Koenig, until approximately one month after the contract was executed. In light of these circumstances, it is clear that the basic purpose of Section 351.400, and indeed its literal requirement of two-thirds shareholder approval, was more than satisfied,[36] and that Richard Koenig was specifically authorized to consummate the sale. That Robert Koenig withdrew his approval after execution of the contract does not alter that fact.

*Anticipatory Breach of the Contract and its Effect Upon Performance of the Conditions Precedent*

Channel Seventeen contends that Wooster may not enforce its rights under the contract of July 18, 1979, because it has not

---

35. Defendants have argued at length that the contract of July 18, 1979, is "null, void and unenforceable" not only because of the alleged failure of Richard Koenig to obtain the approval of Tapeswitch, but also because Channel Seventeen did not obtain a directors' resolution of approval, did not give a written or printed notice of the proposal, and did not conduct a shareholders' meeting. But this contention ignores the obvious reality that both corporations, Tapeswitch and Channel Seventeen, were controlled by the brothers Koenig. And, as siblings, the brothers dealt with each other informally and outside a formalized corporate structure. Missouri law recognizes those realities. For example, in *Beaufort Transfer Co. v. Fischer Trucking Company, supra*, the Supreme Court of Missouri distinguished its earlier decisions dealing with cases in which the interests of minority shareholders had been ignored and held that, in circumstances such as these, the failure to comply literally with the requirements of Section 351.400 is not fatal to the contract. On this basis, *Kaufman v. Henry*, 520 S.W.2d 152 (Mo.App.1975) and *Shell v. Conrad*, 153 S.W.2d 384 (Mo.App.1941), cases cited by defendants, are clearly distinguishable. In those cases, the basic purpose of Section 351.400, the protection of the interests of dissenting shareholders, had been frustrated. Here, they have not. As previously noted herein, Robert Koenig, acting at all times with the authority of Tapeswitch, was fully notified of the essential terms of the contract, discussed the matter with his brother, and approved the sale. Since the brothers acted as the sole directors of Channel Seventeen, and represented all of its shareholders, even the requirements of the technical provisions of Section 351.400 were fulfilled.

36. Defendants have cited no authority for the proposition that every term of a contract to sell the corporate assets must be approved by two-thirds of the voting shareholders. In the case at bar, Robert had been apprised of the essential and basic terms and concepts of the sale, both through the commitment letter and copies of the proposed sales contract. And, through his objective actions approved them.

fulfilled certain conditions precedent which are a part of that agreement. Specifically, Channel Seventeen asserts that Wooster is barred from suit because it did not give Channel Seventeen "notice of the specific nature of the breach" thirty days before the commencement of this action; it did not file an application for consent by the Federal Communications Commission within sixty days of the contract date; it did not obtain the approval of the contract by its board of directors; and it did not fulfill the escrow clause of the contract by placing $50,000 on deposit with an escrow agent; and finally, it has not been admitted to do business in the State of Missouri.

■ An anticipatory repudiation of an agreement constitutes a total breach of the contract if there has been "a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties." Restatement of Contracts § 318 (1932). *See also Transport Mfg. & Equip. Co. v. Fruehauf Trailer Co.*, 295 F.2d 223, 234 (8th Cir. 1961). Here, there can be little question that Channel Seventeen, through communications by the brothers Koenig, made such a positive statement. Both by mailgram and by letter of August 21, 1979, Wooster was informed by the brothers that the agreement would be rejected, that "there will be no sale," and that "Channel Seventeen, Inc. does not recognize and cannot honor the document of July 18, 1979." A more positive statement of repudiation cannot be imagined.

In the wake of that unequivocal repudiation of the contract, a rejection of the agreement in its entirety, Wooster was entitled to suspend its performance of the conditions now relied upon by Channel Seventeen. See 5 Williston, Contracts § 699, pp. 344–359 (3d Ed. 1961). Cf. *Hogan v. Barnett Company*, 179 F.2d 836 (8th Cir. 1950), and *Rutledge v. Miller*, 248 F.Supp. 994 (E.D.Mo.1965). For, "no man is compelled to do a useless act, and if performance of a condition will not be followed by performance of the promise which is condi-

tional, it is useless for the intended purpose and it is therefore unnecessary to perform the condition." *Thwaites v. John Hancock Mutual Ins. Co.*, 47 F.Supp. 737, 740 (S.D. Cal.1942).

Shortly after the repudiation of the contract by Channel Seventeen, Wooster demanded that it retract that repudiation and perform its obligations under their agreement. Channel Seventeen did not respond. Moreover, the specific nature of the breach, the outright repudiation of the contract, was entirely clear to Channel Seventeen, as demonstrated by its earlier communications with Wooster representatives. Under these circumstances, notification by Wooster and a thirty-day waiting period prior to suit could have served no purpose.

At the time of the breach, Wooster representatives were in the process of gathering the information required by the Federal Communications Commission for its license application. It suspended those efforts only after it received notification of the repudiation of the contract by Channel Seventeen. Wooster was entitled to take Channel Seventeen at its word and proceed upon the premise that Channel Seventeen would not honor the contract. Channel Seventeen cannot now therefore avoid its obligations by its insistence upon performance of this contractual provision as a condition precedent. *See Watson Bros. Transp. Co. v. Jaffa*, 143 F.2d 340, 347–48 (8th Cir. 1944); and *Beaufort Transfer Company v. Fischer Trucking Co.*, supra at 44–45. For the same reasons, Channel Seventeen cannot avoid its contractual responsibilities by insisting that Wooster qualify to do business in the State of Missouri as a predicate to enforcement of its legal remedies in this Court.

Two contentions concerning alleged conditions precedent remain, neither of which present merit. First, it is abundantly clear that Wooster had, in fact, placed the sum of $50,000 in an escrow account immediately after the execution of the contract and that this deposit has remained with the escrow agent since. Second, contrary to the assertion of Channel Seventeen, it is also evident that the Wooster representatives, Timothy

and Albert Dix, were fully authorized by their corporation to negotiate and execute the contract of July 18, 1979, and that this authorization has been affirmed by the subsequent actions of the Wooster board.

*Claims of Misrepresentation Affecting the Validity of the Contract and the Availability of Specific Performance*

■ Both Channel Seventeen and Tapeswitch claim that representatives of Wooster actively misrepresented material facts and engaged in dubious business practices in their efforts to obtain an executed contract for the sale of the assets of Channel Seventeen. These actions, defendants urge, invalidate the contract and prevent Wooster from obtaining specific performance of its provisions.

In its trial brief, Tapeswitch points to three such claimed practices: (1) that Wooster offered "boot" to Richard Koenig to entice his agreement and then "aided him in concealing the fact from the minority [shareholder]," (2) that Richard Koenig was "rushed" into the execution of the contract, (3) and that Wooster representatives "deleted the space for the minority [shareholder] signature and forewent the corporate seal." Channel Seventeen cites these, and a multitude of other perceived misrepresentations or misdealings, which it contends invalidates the contract and removes specific performance as a viable remedy.

The contentions of the defendants simply are not borne out by the facts established at trial. First, the commitments made to Richard Koenig and Thomas Koenig by Wooster representatives were made entirely at the request of the two Koenigs. The separate agreement to employ Thomas Koenig was suggested by his father and was made at his insistence. The other separate agreement to permit the installation of two-way communications equipment on the station tower was also made at the urging of Richard Koenig and was executed well after the contract of July 18, 1979. The earlier consulting fee agreement, the only separate "boot" offered at the initiative of Wooster, was removed from the contract upon the objection of Robert Koenig.

There is simply no evidence that Wooster representatives attempted to conceal these agreements from Robert Koenig or Tapeswitch. Moreover, there is absolutely no evidence to support the claim that these agreements adversely affected the interest of the minority shareholder.

Second, defendants cannot legitimately assert that Richard Koenig was "rushed" into the execution of the July 18, 1979 contract. Wooster representatives first approached Koenig more than one year prior to the execution of that contract. He met on several occasions with various Wooster representatives over that period of time. When negotiations began in earnest, he was provided with several proposed contracts, each modified only at his own insistence or to meet the exigencies of the circumstances. On July 17, 1979, he as well as his brother, had been provided with a proposed contract which basically was to become ⸏ final agreement. Well prior to that date, Timothy Dix, acting as the Wooster representative, advised Koenig that he was willing to discuss any proposal with Koenig's attorney, thus suggesting that Wooster expected Channel Seventeen to be represented by counsel before and during the negotiations. Richard Koenig did, in fact, retain both an attorney and an accountant to assist in the negotiations. He himself was an experienced businessman. He did not, however, express any misapprehensions about the manner by which the contract was being negotiated or that he was being "rushed" into it. Perhaps a period of reflection would have been advisable. But, as Koenig's attorney expressed it at trial, "Richard had a deal and he wanted it done ..."

Third, there is absolutely no validity to the contention that Wooster representatives committed a "sharp" business ploy by substituting the signature lines on the contract in an effort to defeat the interests of the minority stockholder. As previously found, Timothy Dix was concerned that minority stockholder approval be secured prior to the execution of the contract. To that end, he supplied Richard Koenig with a letter of commitment clearly setting forth the basic

terms of the proposed contract for the purpose of indicating the agreement of his brother to the transaction. At the time of the contract negotiations, he was assured by Richard Koenig that such authorization had been obtained. Moreover, upon his inquiry, he was also informed by Koenig's counsel that the signature of the minority stockholder upon the contract itself would be unnecessary because approval had already been given by the letter of commitment. These actions evidence no misdealing on the part of Wooster representatives in the matter.

A reading of the remainder of the claims of Channel Seventeen of misrepresentation of misdealing on the part of Wooster reveals that they are either frivolous, or as in the case of those mentioned above, unsupported by the evidence at trial. Accordingly, it has not been demonstrated that the contract is invalid or that specific performance is unavailable for these reasons. *Compare Ragan v. Schreffler*, 306 S.W.2d 494, 499 (Mo.1957)

### Availability of Specific Performance

Wooster primarily seeks specific performance of the contract of July 18, 1979. Defendants, on the other hand, contend that specific performance will not lie because of the impossibility of performance of that contract, mutual mistake as to the material facts by the parties to it, and the adequacy of Wooster's remedy at law.

As an equitable remedy, "[s]pecific performance will not be ordered when the party claiming breach of contract has an adequate remedy at law." *Laclede Gas Company v. Amoco Oil Company*, 522 F.2d 33, 39–40 (8th Cir. 1975). But "a remedy at law adequate to defeat the grant of specific performance 'must be certain, prompt, complete and efficient to attain the ends of justice as a decree of specific performance.'" *Laclede Gas Company v. Amoco Oil Company, supra* at 40, *quoting National Marking Machine Company v. Triumph Mfg. Company*, 13 F.2d 6, 9 (8th Cir. 1926). In the present case, however, Wooster's remedy at law would not be adequate to afford it the benefit of the agreement which it struck with Channel Seventeen. Uniformly, the expert testimony at trial established that Channel Seventeen, and more specifically station KCBJ–TV, is a "unique" property, unique in the sense that it presents an unusual potential for future growth in a stable and growing market. Because of its potential for expansion with proper management and infusion of capital, its relative position in the local and national markets, its network affiliation, its licensing and frequency, and its physical assets, among other things, Channel Seventeen is unique. Accordingly, Wooster's remedy at law would not provide a certain, prompt, complete or efficient substitute for the specific performance of the contract. *Hawaiian Paradise Park Corporation v. Friendly Broadcasting Company*, 414 F.2d 750 (9th Cir. 1969); and *Commercial Radio Institute Inc. v. Western Pennsylvania Christian Broadcasting Company*, 428 F.Supp. 1054 (W.D.Pa.1977).

But Channel Seventeen and Tapeswitch argue that specific performance of the contract is not available to Wooster because of the impossibility of its performance and mutual mistakes of fact regarding certain facts upon which the contract was premised. Performance of the contract is impossible, they urge, because the site upon which the transmitter tower of KCBJ–TV is located was, and still is, owned by a third person who is not a party to this action.

"A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can be done only at an excessive and unreasonable cost." *Transatlantic Financing Corporation v. United States*, 363 F.2d 312, 315 (D.C.Cir. 1966), *quoting Mineral Park Land Company v. Howard*, 172 Cal. 289, 293, 156 P. 458, 460 (1916). *Accord* Restatement Contracts § 454 (1932). The contract of July 18, 1979, provided, in part, that Channel Seventeen would "be able to transfer the site or cause it to be transferred in fee to [Wooster] at closing." Because title to that site is held by a third party, the land cannot be conveyed in fee to Wooster upon the closing of the contract. But Wooster states that it is

willing to take less; that it is willing to take whatever title Channel Seventeen can convey, if any, with an abatement in the purchase price.

■■ As earlier found herein, Channel Seventeen currently holds a lease to the tower site which will allow it to exercise an option to buy the land for the amount of $10,000 at the end of its term. That lease is, by its terms, assignable to a purchaser of Channel Seventeen. The performance under a decree of specific performance need not be totally identical to that which is provided by the contract as long as the agreement of the parties is substantially performed. *See Wilkinson v. Vaughn*, 419 S.W.2d 1 (Mo.1967); *Ray v. Wooster*, 270 S.W.2d 743 (Mo.1954); and *Tebeau v. Ridge*, 261 Mo. 547, 170 S.W. 871 (1914). Here, the transmitter site, a parcel of one acre of land, is but a minor part of the total agreement of the parties. Since Wooster is willing to accept the leasehold interest with the option to purchase this land at a future date, the impossibility of a present conveyance of the land in fee does not defeat the remedy of specific performance. Nor is the mutual mistake of the contracting parties, if any, sufficient to invalidate the contract or defeat the equitable remedy Wooster now seeks. Under these circumstances, the purchase price of the assets of Channel Seventeen can and should be abated by the amount necessary to exercise the option granted by the lease. *Ray v. Wooster, supra.*

■ Finally, Channel Seventeen contends that a mutual mistake existed concerning the remedies for breach of the contemplated contract by the parties at the time of its execution. Channel Seventeen asserts that both Albert Dix and Richard Koenig believed that upon breach of the contract, Channel Seventeen would only be liable for the amount stated in a liquidated damages clause of the contract. Paragraph 7.1(a) of the contract of July 18, 1979, provides that Channel Seventeen may receive "Fifty Thousand Dollars ($50,000), as liquidated damages" if "closing is not achieved by reason of a breach by [Wooster] prior to closing ..." On the other hand, Paragraph 7.1(b) of the contract clearly provides that the remedies available to Wooster would include "the right to specific performance, which [Channel Seventeen] acknowledge[d] [was] an appropriate remedy because damages at law would be inadequate." The testimony at trial establishes that this clause was fully discussed and negotiated during the meeting of July 17th and that it was explained to Richard Koenig by Timothy Dix.[37] Moreover, "[a] person cannot avoid a contract on the ground ... that he supposed it was different in terms." *Ragan v. Schreffler*, 306 S.W.2d 494, 499 (Mo.1957). Based upon the testimony at trial, it cannot reasonably be found that a mutual mistake existed at the time of execution of the contract concerning the remedies available to the parties upon its breach.

*The Cross-Claims of Tapeswitch Against Richard Koenig and the Counterclaims of the Defendants*

No credible testimony or evidence was adduced at trial which would support the claim of Tapeswitch against Richard Koenig for indemnification. Therefore, the cross-claim will be dismissed. Moreover, based upon the findings of the Court herein, the counterclaims of the defendants will also be dismissed.

*Attorneys Fees of Wooster*

■ Wooster, at trial, presented evidence of the fee statements which had been presented to it by its attorneys for services rendered both before the commencement of this action and after the filing of its complaint to October of 1980. Apparently, this evidence was submitted in support of Wooster's claim for consequential damages and also pursuant to a claim for attorney's fees should specific performance be award-

37. Timothy Dix testified that "[w]e discussed the mechanical aspects of [the liquidated damage and specific performance clauses], and I affirmed that we required the right to specific performance if we were going into this contract ...," and "I made a statement that this would allow us to compel Channel Seventeen to sell its assets to us ..."

ed.[38] But, as found earlier herein, plaintiff has not presented evidence of the reasonable amount of its attorney's fees attributable to the instant litigation. However, even if Wooster had presented such evidence, this is not the appropriate case for the award of Wooster's attorney's fees. Cf. *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 241, 95 S.Ct. 1612, 1613, 44 L.Ed.2d 141 (1975), and *Wolf v. Cohen*, 379 F.2d 477 (D.C.Cir.1967).

For the reasons stated above, it is therefore

ORDERED that judgment be entered in favor of plaintiff Wooster Republican Printing Company and against defendants Channel Seventeen, Inc. and Tapeswitch Corporation of America, and that a Decree of Specific Performance be entered herein. It is further

ORDERED that, within 20 days of this date, plaintiff Wooster Republican Printing Company submit herein a proposed Decree of Specific Performance, setting forth, with particularity, appropriate provisions in conformity with the foregoing Findings of Fact and Conclusions of Law, including specific provisions for assignment of the lease of January 21, 1977, and an abatement in the purchase price to reflect the costs of the option contained therein, and the monthly lease payments for the remaining term of the lease. It is

ORDERED that defendants Channel Seventeen, Inc. and Tapeswitch Corporation of America shall make whatever objections they may have concerning the proposed Decree of Specific Performance within 10 days of its submission herein. It is further

ORDERED that the counterclaims of defendants Channel Seventeen, Inc. and Tapeswitch Corporation of America should be, and they hereby are, dismissed. It is further

ORDERED that the cross-claim of defendant Tapeswitch Corporation of America against defendant Channel Seventeen, Inc.,

and the third-party claim against Third-Party Defendant Richard Koenig should be, and they hereby are, dismissed. It is further

ORDERED that the claim, if any, of Wooster Republican Printing Company for an award of attorney's fees should be, and it hereby is, denied. It is further

ORDERED that the costs of this action should be, and they hereby are, taxed against defendant Channel Seventeen, Inc., and Tapeswitch Corporation of America, all to be borne equally.

---

38. The Standard Pretrial Order, agreed upon, signed by the parties, and submitted herein, makes no mention of a claim for attorney's fees

should Wooster prevail upon its prayer for specific performance.